MOORE FILTER CO. v. TONOPAH-BELMONT DEVELOPMENT CO.†

(Circuit Court of Appeals, Third Circuit. November 4, 1912.)

No. 1,612.

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—FILTERING PROCESS FOR TREATMENT OF METAL-BEARING SLIMES.

The Moore patent, No. 764,486, for a filtering process, for recovering the metal contained in metal-bearing slimes, was not anticipated and discloses patentable invention; the process shown being a radical departure from the whole prior art and an original and pioneer step in metal recovery by filtration, to make possible the further application of the cyanide treatment of slimes. Claims 4 and 5 also *held* infringed.

2. PATENTS (§ 175*)—PROCESS PATENT—INFRINGEMENT.

As the apparatus shown in a process patent is only to show that the process may be practically applied, it follows that such illustrative apparatus does not limit the process patentee to that type of machine alone; but the test of infringement of a process patent is whether the apparatus used, no matter what its form, utilizes the process.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 250, 250⅔; Dec. Dig. § 175.*]

Appeal from the District Court of the United States for the District of New Jersey; John Rellstab, Judge.

Suit in equity by the Moore Filter Company against the Tonopah-Belmont Development Company. Decree for defendant, and complainant appeals. Reversed.

For opinion below, see 195 Fed. 530.

Gifford & Bull, of New York City, for appellant.

William Houston Kenyon and Harold Binney, both of New York City, for appellee.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied February 13, 1913.

BUFFINGTON, Circuit Judge.  In the court below the Moore Filter Company, the owner of patent No. 764,486, granted July 5, 1904, to George Moore, for a filtering process, filed a bill charging the Tonopah-Belmont Development Company with infringement thereof.  On final hearing that court, in pursuance of an opinion reported in 195 Fed. 530, dismissed the bill on the ground that infringement was not shown.  Thereupon the complainant took this appeal.

[1] As applied in the present case, the patent concerns the process of filtering metal-bearing slimes, and is known as the Moore process. The respondent's filter is for the filtration of like slimes, and embodies the Butters process.  Both processes utilize the cyanide ore treatment, and the question before us is twofold: First, does Moore's process involve invention? and, second, does the respondent's Butters filter make use of the Moore process?  The cyanide ore process came into use about 1887, and is the real foundation of the tremendous increase of gold production in the last two decades.  It is now the prevalent method of treatment.  In it the ore is first crushed and then placed in tanks containing a solution of cyanide of potassium.  This solution percolates through the crushed pulverized mass, and, being a solvent of gold, carries off such gold as is subjected to its action. This is called "leaching," and any crushed ore through which percolation took place was termed "leachable."  For example, if the ore treated was of such a character that, when crushed, it was reduced merely to the condition of sand, then the recovery of its metal by the cyanide solution might be effected by two methods.  In the first method the cyanide solution would be poured on a bed of sandy crushed ore and be allowed to percolate through it.  In its passage the solution dissolved the metal and passed off as a clear liquid to zinc boxes, or other well-known means of reclaiming metals in solution.  This very simple method was called leaching.  The second was decantation, wherein the crushed sandy material, after having been agitated in the cyanide solution, was permitted to settle, so that the clear liquid containing the dissolved metal might be decanted.  Thus, so long as the crushed grain was so sandlike as to permit leaching, or would settle quickly and completely enough to permit decantation, reasonably satisfactory results were reached by the cyanide process with rich ores; but even with these the treated ore thrown on the dumps often contained large in the aggregate, though small per ton, unleached metals.  This was due to the fact that the solvent did not and could not penetrate the coarse ground particles.  If, however, the ore was crushed finer, to permit the more intimate action of the solution, a pasty mass, called "slimes," was formed, which was unleachable.

The result of this was that great quantities of treated ore went to the dump heap, and while laboratory filtration methods showed the presence, and indeed the extraction, of such metals, yet no one devised any commercial means or process by which this metal-laden dumpage or slime could be avoided or utilized.  As a value-containing, but unavailable, feature these ore dumps occupied a relation to gold and silver mines like that of a slag pile to a blast furnace or a

culm bank to an anthracite mine. The proofs show the acute recognition of this grievous waste and the vain efforts of a great industry to avoid it. Thus in the Engineering and Mining Journal, under date of October 8, 1892, in an article on "The Cyanide Process in South Africa," by Charles Butters and another, it is said:

"Another difficulty frequently encountered in the application of the cyanide process is the treatment of 'battery slimes'; i. e., the very finely divided material produced during the crushing, and which has a tendency to accumulate in pasty masses. These either resist the penetrating action of the cyanide or retain the dissolved gold during the leaching operation. No satisfactory method of breaking such material has yet been devised. The evil may be lessened by mixing the slimy tailings with clean, coarse sand."

An editorial in the same Journal, dated April 15, 1893, says:

"After a certain amount of experience with any process, its weak points are seen, and opportunities for improvements present themselves. To this rule the cyanide process is no exception. One of the great difficulties experienced in this process, or, indeed, in any lixiviation process, is the treatment of the slimes of an ore otherwise well suited to reduction by the method. They pack upon the filter, forming beds impermeable to the solution, and, even if mixed with large quantities of coarser material, are rarely attacked, *although laboratory experiments will show that their precious metal contents are extremely soluble.* Of such material the Robinson Gold Mining Company, of South Africa, operating one of the largest cyanide plants on the Transvaal, has accumulated 60,000 tons, and the management has long despaired of treating it successfully, as the gold would not amalgamate, nor would the cyanide permeate the mass, if it were charged into vats. The average assay value was between \$7 and \$8 a ton; but the fineness, it is estimated, is such that it would pass a 225-mesh screen."

The same Journal, on August 11, 1894, contains an article on "The Cyanide Process in the Transvaal Mines," which says:

"One of the great bugbears of the cyanide men on the Witwatersrand has been the treatment of slimes, by which is meant the very fine, or, in the case of free milling ores, the clayey, portions of the tailings. Many suggestions have been made for the treatment of these; but the only really practical scheme, so far, appears to be to allow them to dry thoroughly and by screening or otherwise to reduce them to a fine powder. This powder is thoroughly mixed with sand tailings, and the mixtures will usually percolate fairly well."

In an editorial in the same Journal, in speaking of the cyanide process, it is said:

"Undoubtedly the process is well adapted to certain ores, but these appear to exist in but few localities, and we have yet to learn how to extend the use of the process to more common material."

In an article on that process, contributed by Virgoe to the same Journal in 1894, he says:

"Filter presses have been tried in South Africa, but without satisfactory results, owing to their cost and the power required to work them. No mechanical means have yet been devised for the satisfactory separation of pulp and solution in the case of poor leaching ores. *Such an invention would revolutionize the metallurgical world as far as the wet reduction of ore is concerned.*"

Commenting on this article, a correspondent in September, 1894, wrote the Journal:

"Regarding the leaching properties of the ore or tailings to be treated, I am quite in accord with Mr. Virgoe, for badly percolating material (such as battery slimes) is quite the greatest bugbear of the cyanide man."

The following year (1895) Charles Butters, writing to the Journal, said:

"The treatment of slimes is a question of importance, as at present there are many hundreds of thousands of tons of unleachable material lying useless on the hands of the various companies on the Witwatersrand."

And not only was the problem recognized and the need felt, but the agitation of it continued for years. In 1898 the same Journal, after discussing the various efforts in the Transvaal to treat rejected slimes, says:

"Speaking generally, about 75 per cent. of the tailings from the Witwatersrand mills have been treated by cyanide in the usual practice, leaving about 25 per cent. to go into the slimes pit. There is, therefore, a large accumulation of these slimes, besides those which come from current working. What proportion of the old heaps can be treated at a profit is yet to be ascertained; but it seems possible that an appreciable addition to the gold output may come from this source hereafter."

In the same year, referring to the Australian mines, the Journal says:

"A great number of experiments are at present being conducted on the Kargoorlie ores. Nearly all known processes, and several never before heard of, have their advocates. Of course, some valuable knowledge will be gained by all this experimenting, and just as surely a great deal of very expensive machinery will in a short time be consigned to the scrap pile. * * * As yet the finer slimes have not been successfully treated on a large scale; but some one of the ingenious adaptations of the agitation or filter-press processes, now in the experimental stage, will undoubtedly solve the problem."

Indeed, the whole matter was summed up four years later, when, in an article in the Journal of July, 1902, on "A New Treatment of the Slime Problem in Cyaniding Talcose Ores," a writer, Stackpole, says:

"Any metallurgist can appreciate the obstinacy of these sticky masses of mud, which, no matter how treated, would take almost a prohibitive length of time to percolate. Although experiments show that over 90 per cent. of the values in the clay is soluble, the ordinary methods only permit an extraction of 50 per cent."

The first suggestion for the solution of this world-wide problem is found in the Journal of December 5, 1903, being a communication from George Moore, wherein he described the process for which the patent in suit was issued to him the year following. We deem a quotation from that article proper at this point, not only as being in the line of historical sequence of the art, but for the further reason that our conclusion that Moore fully realized the scope of his invention, and disclosed the same in his specification, is fortified by the fact that he had explained and disclosed it fully to the engineering world a year before his patent issued. In his article, after describing his process as installed at a certain mine, and asserting that the advantages of his process were:

"First, a saving of from 40 to 60 cents per ton in labor; second, a saving of a like amount in extraction; third, a saving of over 50 per cent. in the cost of installation"

—he says:

"The saving on extraction is due to the fact that, while *the filter is in the slimes tank and the suction in operation*, an equalizing action is taking place, rendering all parts of the cake of equal resistance to the flow of solution and wash water, so that, when placed in the washing tanks, a perfect displacement of solutions is accomplished. For example, we might consider that it would be possible for one spot on the 2,880 square feet of slimes cake to have more of the coarser slimes of fine sands than the other parts; then there would be less resistance to the flow at this point; therefore the flow would be accelerated here, the slimes would be brought up, and would cover this point more rapidly than the other parts, until, by this increased coating, the resistance to the flow would become the same as at all other points. Thus, when lifted out from the slimes compartment, the entire basket of filters is in condition for washing, and, in practice, we extract all of the soluble gold."

After a careful study of Moore's patent, we have reached the conclusion that his process is a radical departure from the whole prior art, and was an original and pioneer step in metal recovery by filtration. Like all important inventions, its merit is its simplicity, and its novelty consists in his utilizing the simple elemental processes of nature. These processes he has, of course, neither discovered nor invented; but he has utilized them, in combination, in a manner never before used, and has thereby secured a new result. Briefly stated, the gist of Moore's instruction to the mining world was to filter an unleachable mass in such a manner as to cake the pasty slime so uniformly and evenly that the resistance of the slimy mass to percolation became uniform and even in every part of the cake. The result of such uniform and even cake resistance was that, when the cake was attacked by the percolating solvent, its percolation was correspondingly uniform, even, and diffusive through the uniformly resisting cake. The solvent having by this uniform and even resistance been itself uniformly and evenly percolated through the mass, it followed that, when this percolated solvent was in turn subjected to a propulsive washing current, such propulsive current, finding no path of least resistance in the uniformly resisting cake or the uniformly percolated solvent, moved forward uniformly and evenly to expel such uniformly distributed percolated solvent. The creation of this uniform and even resistance in the cake is the gist of Moore's process, and such uniformity, as we shall see, is secured by the slime being submerged when subjected to suction. The crux of Moore's process cannot be better or more tersely summarized than in his own words, quoted above:

"The saving on extraction is due to the fact that, while the filter is in the slimes tank [and that means submergence] and the suction in operation, an equalizing action is taking place, rendering all parts of the cake of equal resistance to the flow of solution and wash water, so that, when placed in the washing tanks, a perfect displacement of solutions is accomplished. For example, we might consider that it would be possible for one spot on the 2,880 square feet of slimes cake to have more of the coarser slimes or fine sands than the other parts; then there would be less resistance to the flow at this point; therefore the flow would be accelerated here, the slimes would be brought up, and would cover this point more rapidly than

the other parts, until, by this increased coating, the resistance to the flow would become the same as at all other points.   Thus, when lifted out from the slimes compartment, the entire basket of filters is in condition for washing, and, in practice, we extract all of the soluble gold."

And this is only stating in other words what he set forth in his specification.   Referring to the accompanying drawing, the specification states:

Fig. 3.

"In carrying out the process with the means disclosed in the accompanying drawings, adapted particularly for use in connection with the slimes of precious metals, I introduce a solution to be filtered into a suitable tank *1*, in which I place a filtering device or means *2*, in the present instance made up of a series of filter plates communicating with a common discharge tube *3*. A flexible or other suitable tube *4* connects the tube *3* with any preferred form of hydraulic pump *5* and compressed air pump *5a*, and the filtering means *2* is permitted to remain within the tank *1* until the solid matter within the liquid being filtered has coated the walls of the filtering device to the desired thickness—say, for example, about three-quarters of an inch or more in most cases, but varying somewhat with the character of the slimes which are being handled—and then the same is lifted as by pulley and cable mechanisms *6*, out of and away from the tank, and the pump *5* stopped and pump *5a* operated, so as to apply air pressure to the back of the canvas or to pass a current of air or cleansing current in an opposite direction to the movement of the liquid in the prior step, whereby the solid matter collected by the filtering device *2* will be discharged therefrom."

Applying this description to the illustration, it will be seen that the filter leaves are completely submerged in a tank filled with fluid slimes, and suction is then applied to the interior of the leaves. Applying suction to a filter completely submerged is to form an enveloping case or cake of a pasty nature in the filter. As the cake builds up, it develops a thickness and compactness, which gives the entire cake a capacity of uniform resistance to percolation; for, so long as the resistance is not uniform, the consequent increased rate of deposit at that point would set up, and continue until the rate of flow there became equal to the rate of flow at all other points. The significance of this uniform resistance capacity of the cake, and that it was obtained by filter submergence, is stated in the specification, where the patentee, in order to show that, after the filtering process is completed, an entire enveloping cake of uniform resistance capacity can be simultaneously discharged by compressed air, says that such action is owing to the process having produced an enveloping cake of uniform and even resistance capacity. His language is:

"In order to effectively discharge the incrusted slimes from the filter by the agency of compressed air, it is important that the slimes be in the form of a compact layer of requisite resistance and of sufficient thickness, because otherwise when the air pressure is applied portions only of the slimes are blown off, thereby relieving or reducing the air pressure and rendering it ineffective for the removal of those slimes which remain, and necessitating the use of other means—such as scrapers, brushes, and washing—for the complete cleaning of the filter surface. This difficulty is wholly overcome in my process by immersing the filter into the tank containing the slimes in suspension and depositing them in the manner described, the effect of which is to automatically deposit the slimes in a homogeneous layer, as will be readily understood. Hence, when the slimes have been thus deposited to the requisite thickness, the compressed air does not blow holes in the layer of slimes and only partially clean the filter, but it strips off the entire layer of slimes and effectively cleans the filter without the use of auxiliary cleansing mechanism."

Indeed, of the fact that the result of subjecting a submerged filter to suction is an enveloping cake of uniform and even resistance there can be no doubt under the proofs in the case. To question it is to dispute the operation of the laws of nature. In "Cyaniding Gold and Silver Ores," Edition 1907, Mr. Julian, who was called as an expert

by respondent, and who nowhere questions his prior statement, in describing the advantages of submerged leaf filters subjected to interior suction, says:

"One of the chief characteristics of this class of filters is that during the formation of the cake, if the resistance to percolation should vary at any points over the filter surface, an adjustment immediately sets in, owing to the parts of greatest permeability taking on the deposit quickest. This increases the resistance at those points until it brings the rate of percolation equal all over the cake. Washing out the dissolved metals is then done uniformly."

And in his testimony Dr. Chandler, the distinguished scientist and expert for respondent, says:

"Uniformity of resistance of the cake is the natural result of the laws of filtration. Increasing thickness of cake at any one point greatly reduces rapidity of filtration at that point, and thus equalizes the thickness of the cake. When the thickness of the cake reaches a point at which filtration becomes very slow. the continuance of filtration at one part a little longer than at another part will not make any material difference in thickness. Even doubling the time of filtration would have little effect, if filtration is carried to the point, of nearly maximum thickness and resistance, a condition which the Moore patent seems to indicate is desirable."

In view of these well-understood natural laws of filtration, and of the subject-matter of the specification and the application of the process as illustrated by description and drawings, there can be no question that, to those skilled in the art, the cake of uniform and even resistance produced by Moore's process is aptly described by him in his specification as—

"immersing the filter into the tank containing the slimes in suspension and depositing them in the manner described, the effect of which is to automatically deposit the slimes in a homogeneous layer, as will be readily understood."

The specification in the language following:

"However, this cleansing step of the process need not be taken until an intermediate auxiliary step has been performed, which consists in introducing the element 2, after having been coated with the solids, into a tank 7 of water, the drawing or sucking operation of pump 5 being continued while the element 2 is being subjected to the said water bath. When this step is employed, the next succeeding is the operation just described. It will be obvious that the water bath may be employed or not, as desired, the same being preferable when the filter is used for filtering precious ores; the said step tending to wash out the remaining metal held in solution or solvent thereof within the solids coating the filtering device"

—discloses an optional additional step in the process, which step is made an element in the claims here in controversy. The proofs show that in this step important results are obtained, in that substantial quantities of the gold-carrying cyanide solution still remaining in the cake are recovered, and that this recovery is due to the uniform and even resistance capacity conferred on the cake by the disclosed process.

It is contended, however, that the Moore patent is invalid by reason of the disclosures of the prior art. But in our view this contention is based on a failure to recognize the true significance of what Moore really did. Practically his problem was to make commercially possible the recovery of a minute amount of valuable metal from a large quan-

tity of mud. Of the fact of the metal being there, there was no doubt; for that fact, and, indeed, that it was possible to extract it, the tedious and costly method of laboratory filtration showed. It suffices to say that no one of the numerous patents cited did such work, used such process, or effected such results; and if none of them led their inventors or users to the use of any process whereby such work could be done, or even led to a suggestion in their descriptive matter of the possibility of the use of any such process as Moore's, it follows they taught Moore no more than they taught others.

So far as the patent here in question is involved, Moore's disclosure was the process he originated, and not the machine with which he illustrated the use of his process in accordance with the statutory requirement that he file a written description "of the manner and process * * * of using it." To find, therefore, here and there in prior patents, and disassociated from each other, all the mechanical appliances of the combination apparatus which Moore thus illustratively used is not to prove that Moore's process is not original. Viewed from a patent standpoint, the significance of a machine lies, not in its form, but in the principle on which it works, as will be seen in the requirement of section 4888:

."In the case of a machine, he shall explain the principle thereof."

It suffices, therefore, to say that very few of these patents are for even a process, and, as none of them operated on the principle or process of Moore, they cannot be held to forestall or minimize the originality of Moore's subsequent disclosure. And in giving these patents their due relation to Moore's disclosure the fact must not be overlooked that the slime problem which Moore solved only came into existence from the use of the cyanide process, which began, as we have seen, about 1887. It will therefore be manifest that no patents preceding that date, and none subsequent thereto which did not apply to the cyanide process, were calculated to solve the cyanide percolating difficulties that arose in the use of that process.

So, also, to say that, following prior laboratory practice, it was possible to leach and extract the unrecovered ore left in a pasty mass by the cyanide process is not to destroy Moore's patent; for this is to lose sight of the practical value of Moore's process as a workable, economic treatment, as compared with theoretical possibility of laboratory practice. By repeated dilution the laboratory could, and we will assume did, recover with practical completeness all such unrecovered metal; but this had been done with an expenditure of time, labor, and expense out of all proportion to the value of the metal. When, therefore, Moore disclosed a process by which such recovery was made enormously profitable, and by which he turned a dump heap, which, under all known processes, machines, and laboratory methods, was worthless, into profitable ore, we are constrained to give little weight to the suggestion that his process was either anticipated, a mere advance incident to the art, or involved no invention.

So, also, it is said that the step described in his claim, viz., "further impoverishing the solids by a cleansing operation," was merely the

washing or dilution of the prior art. Considered in its literalism and in isolation, such contention may seem plausible; but, considered as a step in Moore's process, it takes on new significance and value. Bearing in mind that, in the prior steps of the process covered by this claim, the completely submerged filtering medium has formed a cake of uniform resistance at all points, and by reason of such uniformity the solvent has percolated and is permeating the cake, it follows that the step which follows is a nondiluting and bodily displacement of the solvent, and not a diluting intermingling. This displacement, in contrast with dilution, not only saves the time and expense of repeated dilution and refilling, but also obviates excessive dilution of the solvent solution and the necessity of rehandling large volumes of diluted solutions in the recovery of the metal.

It seems, therefore, that the "further impoverishing the solids by a cleansing operation" of Moore's process, owing to the prior step whereby a cake of even and uniform resistance is secured by submergence, is not a mere washing or diluting step, but is one wherein there is exerted a uniform pressure or pushing action through the entire cake surface, thereby in effect advancing a wall of water pressure to force ahead of it from the cake the value-bearing solvent liquid and leave in the cake an equal volume of nonvalue-bearing water. This final result is secured by, first, having built up a cake of uniform resistance to solvent fluid flow, and, secondly, by again submerging the filtering medium and its built-up cake in the nonvalue-bearing displacing fluid. By this displacement by pressure difference only Moore pushes ahead, instead of washes through, the cake-contained metal-carrying fluid. As showing the practically complete metal extraction by the Moore process, we restrict ourselves to the uncontradicted testimony of results at a South Dakota mine, where the original slime contained gold at the rate of $7.90 per ton of dry slime. After filtration alone, the cake still contained $2.75 per ton of dry slime. After being then subjected to the displacement step, there was left in the cake but 4 cents of gold per ton of dry slime.

Being of opinion, therefore, that Moore's process was novel, useful, and inventive in character, his patent is valid, and we next turn to the question of infringement. As claims 4 and 5 furnish sufficient bases for deciding that question, so far as the respondent's device is concerned, and as some questions, not necessary to be here decided, exist as to claim 10, we restrict ourselves to a consideration of claims 4 and 5.

[2] In considering the question of the infringement of a process patent, it must be borne in mind that the monopoly secured by the claims is, generally speaking, a monopoly of the process, and the test of infringement is whether such process is utilized by the infringer. As the apparatus shown in a process patent is only to show that the process may be practically applied, it follows that such illustrative apparatus does not limit the process patentee to that type of machine alone. If that were the case, a process patent would be of little value. So distinctively and separate in the patent law are process and apparatus for utilizing such process that where, after a patent for a pro-

cess by one inventor, a second inventor might patent a novel apparatus for utilizing the process, the situation would arise that the inventor of the process could not employ his process in such machine without license from the machine patentee, and the latter could not use the process in his machine without license from the process patentee. It will therefore be evident that the test of process infringement is not the similarity of apparatus, but rather whether the apparatus, no matter what its form, utilizes the process.

Tested by this standard, it is clear to us the respondent's device infringes. In form the particular apparatus shown in Moore's patent and the apparatus of respondent vary in the number of tanks, in the difference between changing the fluid which envelops the filtering medium, as in respondent's device by allowing the filtering medium to remain stationary in one tank while the submerging fluid is first drawn off, and the second submerging bath is then drawn into the same tank, while in Moore's the filtering medium is raised from the submerging bath in the first tank, and then lowered into the second submerging bath in a second tank. But this difference in numbers of tank and of respective withdrawal and replacing of different baths in no way affects the identity of the process, for it is manifest that Moore could in his patent specification have shown the use of his process just as well by using respondent's apparatus, had he known of it, as his own. Both alike use the principle of submergence and intra-leaf suction to create the uniform and even resistance of the cake, and both alike use the principle of intra-leaf pressure, Moore using air, and the respondent water, to shed the uniformly-resisting cake from the filter; for the mere fact of the output being carried off as a dry product in Moore's case to a dump heap and in respondent's in fluid form to a slime pit, does not go to the substance of the process. In the essentials that involve the invention the two are alike. Had an apparatus such as respondent's, operated as it is, been in use prior to Moore's there would have been no invention either in the process or in the apparatus shown in Moore's patent; and what, if preceding a patent, would have anticipated it, equally infringes if subsequent. We therefore hold the fourth claim is infringed.

As we are of opinion, and so find from the proofs, that there is in respondent's device a "removing the medium while continuing the drawing action," the fifth claim is also infringed.

The decree of the court below is therefore reversed, and the cause remitted, with instructions to enter a decree adjudging claims 4 and 5 valid and infringed, and for such action by that court in the way of injunction and accounting as it shall deem fitting.