### McCLAVE–BROOKS CO. v. M. H. TREADWELL CO. et al.

(Circuit Court of Appeals, Third Circuit. January 20, 1915.)

#### No. 1872.

PATENTS ☞328—VALIDITY AND INFRINGEMENT—GRATE.

> The McClave patent, No. 831,178, for a grate designed for burning culm or other very fine coal by the use of double-beveled overlapping grate bars having a narrow, inclined opening between them instead of a vertical one, discloses a device novel in conception, useful in results, and inventive in character, and is valid; also *held* infringed.

Appeal from the District Court of the United States for the Middle District of Pennsylvania; Chas. B. Witmer, Judge.

Suit in equity by the McClave-Brooks Company against the M. H. Treadwell Company and the Stoever Foundry & Manufacturing Company. Decree for defendants, and complainant appeals. Reversed.

For opinion below, see 212 Fed. 442.

Melville Church, of Washington, D. C., and Welles & Torrey, of Scranton, Pa., for appellant.

Edwards, Sager & Wooster, of New York City, and A. A. Vosburg, of Scranton, Pa., for appellees.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

BUFFINGTON, Circuit Judge. In the court below the McClave-Brooks Company, the plaintiff, owner of patent No. 831,178, granted September 18, 1906, to William McClave, for a grate, charged the M. H. Treadwell Company and the Stoever Foundry & Manufacturing Company with infringement thereof. On the question of infringement that court, in an opinion reported at (D. C.) 212 Fed. 442, held:

> "That the defendants' device embodies the structural features and functions shown in the complainant's grate cannot be successfully denied. An effort at comparison is useless, and would indeed be difficult, on account of similarity."

On the question of validity, it held the patent did not involve invention and was void. From a decree dismissing the bill, the plaintiff took this appeal.

In our view this case is of more importance than a mere patent dispute over conflicting types of furnace grates for ordinary coal. Mc-

---

Clave's patent concerns the use as fuel of the culm banks of the anthracite coal fields of Pennsylvania—a very different problem from the burning of common coal. It is, as its specification states, "designed principally for use in the burning of exceedingly fine anthracite fuels"; and, unless the uncontradicted testimony that this invention has successfully solved difficulties in the economical and satisfactory use of that fuel is untrue, it would seem the device before us is of more than ordinary moment. The extent of culm waste is apparent, when it is recalled that the Pennsylvania State Commission of 1893 reported that, since the commencement of mining, the coal and coal dirt sent to the culm banks has been 35 per cent. of the total production; or to put this in concrete form, it is estimated the workable coal that has been dumped in the anthracite coal field of Pennsylvania would cover the state of Rhode Island evenly with solid workable coal 125 feet deep. These great culm banks were for years regarded as worthless and as nuisances in the way of haulage and use of valuable space. In that regard they resembled the dump heaps of gold and silver mining referred to by this court in Moore v. Tonopah, 201 Fed. 532, 119 C. C. A. 626, where we said:

"Great quantities of treated ore went to the dump heap; and while laboratory filtration methods showed the presence, and indeed the extraction, of such metals, yet no one devised any commercial means or process by which this metal-laden dumpage or slime could be avoided or utilized. As a value containing, but unavailable, feature these ore dumps occupied a relation to gold and silver mines like that of a slag pile to a blast furnace or a culm bank to an anthracite mine."

It is clear, therefore, that any discovery which substantially contributes toward the utilization of such supposedly worthless dumpage challenges the careful attention of those charged with the administration of the patent laws.[1]

The proofs in this case show that William McClave, the patentee, was a resident of the anthracite regions, and had for many years been engaged in a study of the fuel use of bituminous duff, anthracite culm, and of coals generally. In 1882 he began a series of experiments to improve methods, and since then has taken out a number of patents preceding the one here involved. The successful burning of very fine coal involves several problems. To get the desired heat from such fuel there must be a thick, deep bed of culm. Such fine coal packs closely, and combustion must take place from below. This was effected by a draft forced up from a sealed ash pit. To utilize, while it was still in the bed of the coal, the gas produced by such forced combustion, it was necessary to keep the blast from breaking through such bed in spots. In case it so broke through the draft would center in such paths of least resistance, and two results would follow: First, such

[1] The problem of culm use is one which has caused much discussion. See Engineering Magazine, vol. 11, p. 655; Engineering News, vol. 34, p. 426; American Electrician, vol. 13, p. 434; Engineering and Mining Journal, vol. 80, p. 1113; American Contract Journal, vol. 16, p. 314; Transactions of the American Institute of Mining Engineers, vol. 20, p. 628; Same, vol. 22, p. 581; Railroad Gazette, vol. 34, p. 466; and Journal of the Franklin Institute, vol. 142, p. 26.

gases of combustion as were generated would not be burned in the coal body, with the undesirable results hereafter noted; and, second, the coal body outside of these paths of least resistance would not be thoroughly and economically burned. It will thus be seen that the maintenance of a bed of uniform resistance to the passage of the draft was of vital importance. The difficulty of doing so was increased by the necessity of frequent cleanings of the grate caused by the rapid forming of ashes and clinkers incident to this fuel. To do this it was necessary to push or pull the burning mass to one end of the furnace chamber and then tilt the grate bars at the other end to discharge such clinkers. The fuel was then redrawn over to the chamber end thus cleaned. In addition to draft difficulties, others arose from grate bars. Under intense heat it was found that grate bars increase in length. This increase is not the usual contraction and expansion of iron, but is a growth which permanently lengthens the bar. Thus, a scientific witness of the defendants says:

"The expansion referred to in the patent in suit is a phenomenon familiar to artisans. It is not the temporary expansion which takes place when metal is heated, but is a permanent expansion, continuing even after the metal is cold. It is produced gradually during weeks or months of exposure to high temperatures and is observed more particularly in the case of iron. The percentage of expansion is small, but has nevertheless, under some circumstances, to be taken into account."

One of the plaintiff's witnesses says:

"When heat of a high temperature, such as that emanating from incandescent carbonaceous fuel, which is in contact with said metal, the crystalline structure, and probably also the molecular structure of the iron, is thrown so far apart that the crystals become disarranged to an extent that they do not nest back into the same positions or nestings that they formerly occupied, and the metal is said to have grown and really has grown permanently to the extent of the stoppage by such disarrangement.".

Referring to caps of grate bars such as are here involved, the witness adds:

"Caps about 12 inches long under the intense heat of some boiler furnaces would grow from three-eighths to half an inch or more."

It is therefore manifest that, where sectional, dumping grates are used, their adjacent ends must be initially spaced far enough apart to allow for this metallic growth, otherwise the grate bars will jam, buckle, or overlap. But this initial, and substantially wide, opening would be highly objectionable where culm was used. When culm becomes red hot it runs like dry sand and drops through and makes an opening in the fuel bed through which the forced draft finds a path of least resistance. The mischief caused by such breaks through the bed is shown in testimony quoted below. These difficulties McClave overcame by a device which, in the afterlight of accomplishment, is very simple, but which no one had ever suggested. Mechanically speaking, he simply double-beveled the one end of an abutting, sectional dumping grate bar. As the court below rightly said, "Any foundryman would know how to do it;" but the significance of McClave's instruction to the art did not lie in telling how to double-bevel the end of a grate bar, but in disclosing the important functional use that could

be made of such double-bevel in successfully burning fine coal. This double-bevel, overlapping grate bar—shown, for example, in the accompanying patent drawing—made possible, amongst others, three essentials to the successful burning of culm:
First, the initial spacing apart of the grate bars without allowing the fine coal to run through the spacing. This was done by providing an inclined, instead of a vertical, opening between the ends of adjacent grate bars. Second, it provided a harmless path or outlet for the metallic growth of grate bars. This was done by paralleling instead of abutting the grate bar ends, so that their growth, instead of jamming each other or closing the initial opening, allowed the growing bars to parallel each other and maintain an opening between them. Third, the upper bevel kept the growth of the bar from making the furnace floor so abruptly uneven as to catch the fireman's scraper and prevent the rapid shift of the fuel requisite to its use. It will thus be seen McClave's device by its narrow inclined space prevented fuel escape, provided initially, and thereafter maintained, suitable air passages where the sections met, prevented the forced draft concentrating at these openings, and thereby secured uniform draft passage through the entire fuel bed, caused the gases of combustion to be burned in the coal bed, and kept the growth of the bars from creating unevenness in the furnace floor. Mechanically, by the use of a stop, he effected complete control over the size of the opening, and by maintaining such opening between the ends of the grate bars he lessened their burning out. These features were pointed out to those familiar in the art in his specification:

"In forming a rocking grate for the fuels commonly in use it is generally sufficient to bring the edges of the adjacent bars within a quarter of an inch of each other, and the fuel will not run through. When, however, the very small grades of anthracite fuel are burned upon the grate, an opening of the size of a quarter of an inch is usually too large and will militate against the general efficiency of the whole grate, principally because small coal sifts through between the bars; and where a forced draft is used the air rushes through these lines of least resistance with such force as to tear a bed of small anthracite fuel badly. * * * In this manner also a small space may always be maintained between the adjacent and overlapping ends or teeth of the caps to permit of a small feed of air at that point, which not only assists in the even distribution of air for combustion, but maintains the parts of the grate bars and their caps at a slightly cooler temperature than if they were permitted to rest one upon the other."

That these and other valuable results have been brought about by McClave's device is shown by his uncontradicted testimony:

"The construction that I invented to solve this problem and the one which is now in suit has met with very great success and has practically solved the difficulties that confronted us previous to that time. For the construction named is so arranged that it has a small and uniform mesh throughout the entire grate surface, including spaces between the edges of the bars, said uniformity of spaces being an absolute necessity to the uniform combustion of the fuel, for, if any such meshes are larger than the others, it causes lines of least resistance for the blast to pass through in excess over that of the other portions of the grate surface, thereby blowing such fine fuel above such points into humps and ridges, not only producing unequal depths of fuel in the fire bed, but also making some portions of the bed so thin that

the excess of blast passing through same without combining chemically with the fuel and without even having time to become highly heated would act simply as a dilutent of temperature through the combustion chamber generally, with the consequent loss of efficiency in the furnace. It will be noted also that my construction provides a means for overcoming any deleterious obstruction to the use of fireman's cleaning tools arising from the permanent expansion or growth of the bars caused by the intense heat of the fuel resting upon them, in that the edges of the dumping bars are so beveled from the surface downward in opposite directions to a certain depth forming depressions thereby below the general surface of the grate when the bars are in normal position and form thence in the same direction, so that they may grow and lap upon each other to cover the space necessary for the extreme limit of said growth without having the upper edges project upwards to an extent that would materially interfere or obstruct in any appreciable manner the passing to and fro of the fireman's hoe, or other tools, in the process of cleaning or redistribution of the unconsumed fuel after such cleaning. It may be noted also that this construction provides the use of a space between the edges of the bars (never larger than the mesh in the bars themselves) for the purpose of furnishing additional air that may be required for some kinds of fuel and also for the purpose of taking up, so to speak, a portion of the growth which occurs in such grate bars, thereby preserving for a longer period the plane surface of the entire grate before the edge of one grate bar begins to creep or climb up the beveled edge of the other grate bar. It may be readily seen, however, that the edges of the bars may be started in use with their edges in contact, but in such case, when the bars obtain their full growth, the edge of the bar on the upper side will have traveled to a greater height and the plane surface of the entire grate will have more of a wave line than when an initial space is made in the start. Some kinds of fuel need more air than others, in which case it is more desirable to have such initial space. In no case, however, will the upper edge of the bar project upward in a manner that will interfere to any appreciable degree with the use of the tools heretofore described. It will also be noted that adjustable means have been provided for the maintenance of such space between the edges of the bars where increased air space is necessary, but in case the fireman is negligent in the matter of preserving such space, and the bars grow together, the beveled edge of the bar in front provides a way for the other edge to automatically adjust itself with respect to the adjacent edge without liability of any of the bars becoming wedged between each other on account of such growth, thereby preventing interference in any way with the operation of the dumping of the grate."

The problems confronting McClave, and which he attempted to solve by the patent in suit, are thus stated by him, and were wholly different from those involved in the use of ordinary commercial coal:

"The problem that confronted me when I invented that particular grate arose out of the fact that neither I nor any one else, as far as I could see, had a construction of grates that would serve the purpose of economically burning very small sizes of anthracite fuel, generally known as Nos. 1 and 2 buckwheat. All the grate constructions, so far as I could see or know, had too large a mesh to prevent such fuel sifting through into the ash pit in a large measure, especially when the fire was cleaned and the fuel redistributed on the surfaces of the grate, and had, at the same time, a means for quickly dumping the consumed portions of the fuel when the fire was cleaned. There were some grates of a stationary character, known as perforated plate grates, that would hold the fuel up fairly well, but they were undesirable, inasmuch as they were not very durable, and it took such a long time to clean the fire that the temperature of the furnace would go down very low during the operation, thereby causing a loss of efficiency in the fuel. Aside from this perforate plate grate there were no forms of grate construction, so far as I could see, that did not have too large a mesh for the economic burning of the fine fuel above named, or that did not have a lack of uniform-

ity in size in the air spaces throughout their entire surface, or when made with imperforate plates with a side draft, as may be found. in one or two cases, that were not subject to some of the objections already named, i. e., lack of uniformity of air space or means for sifting into the ash pit, of the unconsumed fuel. The problem also involved a construction in which the mesh would be small enough to hold up such fuel and prevent it from sifting, but that it could be operated quickly when it became necessary to clean the fire and at the same time interfere but little, if any, with the tools used by fireman for purposes of cleaning and redistribution of the unconsumed portion of the fuel left in the furnace for the purpose of kindling a new fire of fresh fuel."

After a careful study of the proofs, we have reached the conclusion that his device was novel in conception, useful in result, and inventive in character. Its gist, from the standpoint of utilizing culm—and the utilization of such fuel was its aim—lies in the distribution of the forced draft through the entire fuel bed—a method not unlike in its sphere that whereby Moore's patent in the case above cited (201 Fed. 536, 119 C. C. A. 626) treated the refuse of ore mines. So far as is now shown, such draft uniformity does not seem obtainable without using a grate bar with a double-beveled end. In reaching our estimate of McClave's device, we have not overlooked the large number of prior patents cited. Nearly all of them were devices for burning ordinary coal. They threw no light on the problem of successfully using fine coal. The few specially addressed to the fine coal problem did not solve it and left no impress on the art. Possibly the most pertinent one is that of Hildreth, No. 112,246, of 1871. It is lacking in the features which make McClave's device a success. Apart from the fact that its date shows it long preceded successful efforts to solve the fuel use of culm, it will be noted that Hildreth had a solid, imperforate grate bottom as contrasted with McClave's perforate grate-bar bottom, and the space between his sections was vertical. Whatever piecemeal anticipation may be suggested by the general resemblances of stray parts of the appliances of the numerous patents cited, it may be said of them all that in none of them is there any suggestion of any use of such appliances for functional purposes as McClave first utilized in his device. Nor have we overlooked the Linde Company grate bar, the upper end of which is rounded so as to resemble a bevel. The pattern from which that bar was cast shows a straight, unbeveled top. The rounded contour, which the well-burned bar in evidence now shows, is palpably but the dropping of the point through the action of heat. Not only is this contour accidental, undesigned, and nonfunctional, but there is no evidence that the Linde furnace was one in which culm was or could be successfully burned.

The Treadwell Company pleads to the jurisdiction of the court and contends it is not answerable for the acts of the other defendant Stoever Foundry & Manufacturing Company. Without detailing the facts, we may say they are such as to bring the case within the principle of Smith v. Elberfeld, 203 Fed. 476, 121 C. C. A. 598. As that case commends itself to us the plea cannot be sustained.

We are of opinion, as was the court below, that there is substantial similarity between the two devices. We therefore hold infringement has been shown.

The decree below will therefore be reversed, and the case remanded, with directions to enter a decree adjudging the patent valid and infringed, and the customary relief.