**J. C. FERGUSON MFG. WORKS, Inc., v.
AMERICAN LECITHIN CO.**

**No. 3284.**

Circuit Court of Appeals, First Circuit.

Feb. 15, 1938.

Ira Lloyd Letts, of Providence, R. I. (Alan P. Cusick, 2d, of Providence, R. I., on the brief), for appellant.

Daniel L. Morris, of New York City (John W. Thompson and Blair, Curtis, Dunn & Hayward, all of New York City, and Eugene J. Phillips and Swan, Keeney & Smith, all of Providence, R. I., and Fish, Richardson & Neave, of Boston, Mass., on the brief), for appellee.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

MORTON, Circuit Judge.

This is an appeal by the original defendant, the Ferguson Manufacturing Company, in a suit brought to restrain contributory infringement of a patent. We shall refer to the parties, plaintiff and defendant, as they appeared in the court below. The patent involved is that to Earl B. Working, No. 1781672, dated November 30, 1930, on application filed July 16, 1930, owned by the plaintiff.

The Working patent relates to the use of lecithin as a component of chocolate mixtures for confectionery and food. It states the invention, "My researches have shown that this graying can be to a considerable extent prevented or in other cases can be greatly retarded, by adding to the chocolate a small amount of lecithin particularly the lecithin obtained from oil-bearing seeds, such as soy bean. The lecithin should preferably be sufficiently purified to remove any disagreeable flavors. The entire mass of purified phosphatides can be used, or the lecithin separated from the other phosphatides. The amount of lecithin to be employed can vary between rather wide limits. Ordinarily from 0.1% up to 0.5% is a sufficient amount of lecithin to add for very materially improving chocolate coatings, but in some cases I may run the amount of lecithin up to 1%, or even slightly more than this."

The claims of the patent are extremely broad; they cover both product and process, and include any and every practical use of lecithin in chocolate coatings and candy. Claims 1, 3, and 13 may be regarded as typical:

"1. A chocolate mass adapted for coating cores of confectionery, comprising chocolate and a small percentage of added lecithin, the percentage of lecithin being sufficient to at least retard 'graying.'"

"3. In the art of making confectionery, the herein described improvement which comprises incorporating, at any stage of the manufacture, with confectionery material including chocolate carrying such

730

amounts of fatty material as to be normally subject to 'graying' a sufficient percentage of lecithin to retard 'graying.'"

"13. In the preparation of chocolate mass, the step of adding, at any stage of the manufacture, about 0.2% to 0.3% of lecithin whereby 'graying' of the finished chocolate product is at least retarded."

The use of chocolate in food and confectionery has long been well known. Lecithin is a natural organic substance which occurs as a component of many animal and vegetable substances, e. g., in yolks of eggs and in soy beans. In the great chemical advance at the beginning of the twentieth century it was isolated and became well known in the chemical field. As early as 1905 lecithin was found and reported in a sample of commercial chocolate examined in the analytical laboratory in the city of Leipzig, Germany; and this analysis was published in the "Journal of Research for Food Materials" in 1907 (vol. 13, p. 52). The same facts were republished in 1907 and, in book form, in 1923, in which "lecithin chocolate" is mentioned and the analysis shows it to be within the Working claims. The content of lecithin in the sample of chocolate analyzed at Leipzig in 1905 is also within that specified in the Working patent. In the United States patent to Martin dated 1915 each of the four claims refers expressly to lecithin as a component of foodstuffs; and in the United States patent to Moskovitz and Jacobson dated 1918 relating to foodstuffs, chocolate among others, it is said, "There can also be added to the emulsion some lecithin." The Bollman British patent of 1926 relates to the use of phosphatides—of which lecithin is one as the above quotation from the patent shows—in cocoa powders and refers particularly to the use of lecithin. In the letter from Conway on behalf of the plaintiff's predecessor to Working dated July 12, 1928, which first called Working's attention to the matter, it was said, "Also, we are developing the use of Vegetable Lecithin as a component of Chocolate, Cocoa, and other food products, not only as a carrier of very high food value, especially for the nerves, not increasing the cost, but increasing the solubility of the Cocoa, which, of course, means that the sediment in the prepared Cocoa will be reduced, and the formation of any sediment at all greatly retarded."

It cannot be doubted that, when the Working patent was applied for, the use of lecithin in chocolate was well known. The effect of it in increasing fluidity is strongly suggested in the Bollman patent, but there appears to have been no previous recognition of its effect in preventing graying.

Until the development of a process of obtaining lecithin from soy beans, it cost about $2 per ounce, and was too expensive for commercial use in foodstuffs. The discovery of that process reduced the price to $1 or less per pound, made it commercially available, and stimulated investigation into what it could be used for. It is a situation in which care should be exercised that the results of mere routine investigation be not accepted as patentable invention. Working's investigations disclosed that the presence of lecithin in chocolate mixtures used for candy delayed or prevented "graying" and advantageously affected fluidity. To summarize, at the time when Working began his investigations which led to the patent in suit, the situation was this: Lecithin was well known and was a staple article of commerce; it had a recognized use and value in medicine and in various kinds of food including cocoa and chocolate; its effect on chocolate in preventing graying and perhaps its effect in increasing fluidity had not been noticed and attributed to it. Working observed these effects, and his discovery of them was the basis of his patent.

As has been said, the claims of the patent are very broad. The Richet chocolate of 1905 is clearly within them; if offered for sale it would infringe the patent, a clear indication that as to some of its claims the patent is invalid for anticipation. The Richet chocolate appears to have been an article of commerce and may have been tested at the time in question to see whether it conformed to pure-food regulations. A chance composition or process which accidentally and ignorantly happened to involve the same element or step which was later discovered and recognized as important has been held not to anticipate a later patent. Pittsburgh Iron & Steel Foundries v. Seaman-Sleeth Co., 3 Cir., 248 F. 705; McKee v. Graton & Knight Co., 4 Cir., 87 F.2d 262. But that is obviously not this case. The Richet use does not stand alone. Merck, a chemical and drug manufacturer, was making and listing a "lecithin chocolate" in 1927. Whether all the claims of the Working patent are invalid, we need not decide, nor is it neces-

sary to discriminate between claims, because on another ground we think the suit clearly cannot be maintained.

■ The plaintiff does not issue licenses under the Working patent; it sells lecithin and it notifies users of lecithin that if they use in candymaking lecithin bought elsewhere they will be sued for infringement of the patent. The defendant deals inter alia in lecithin. It sells it to manufacturers of candy knowing they intend to use it in making chocolate candy. In order to prevent such sales the present suit for contributory infringement was brought. The purpose of the suit is to establish a monopoly by the plaintiff in the sale of lecithin for use in the products and the process described in the patent.

We think it very clear that the plaintiff is not entitled to such a monopoly. In the Carbice Case, Carbice Corp. v. American Patents Dev. Corp., 283 U.S. 27, 51 S. Ct. 334, 336, 75 L.Ed. 819, it was said that a patent could not be used "to secure a limited monopoly of unpatented material used in applying the invention." Brandeis, J. Leitch Mfg. Co. v. Barber Co., 58 S.Ct. 288, 290, 82 L.Ed. ——, January 3, 1938, reaffirms the Carbice Case and is indistinguishable from the case at bar. In the plaintiff's brief, written while the appeal in that case was pending in the Supreme Court, it is said, "The facts in this case (the present one) are in many respects similar to those in Barber Asphalt Co. v. Stulz-Sickles and Leitch, 3 Cir., 89 F.2d 960, 965." In the Leitch Case the defendant sold unpatented material with knowledge that the buyer intended to use it in a process which infringed the plaintiff's patent. The plaintiff sued for contributory infringement, and was held not entitled to recover on the ground "that the owner of the patent monopoly, ignoring the limitation 'inherent in the patent grant,' sought by its method of doing business to extend the monopoly to unpatented material used in practicing the invention. By the rule there declared [in the Carbice Case] every use of a patent as a means of obtaining a limited monopoly of unpatented material is prohibited. It applies whether the patent be for a machine, a product, or a process." Brandeis, J., Leitch Mfg. Co. v. Barber Co., supra.

■ Under the law as it now stands it seems clear that a patent on a process, a product, or a "composition of matter," may not be extended, under the doctrine of contributory infringement, to monopolize the sale of unpatented staple material, used in such product, process, or composition. Broad expressions as to contributory infringement used in earlier cases relied on by the plaintiff must now be read with the Carbice and Leitch Cases in mind.

The decree below must be vacated, and the case remanded to the District Court, with instructions to dismiss the bill with costs in both courts.

The decree of the District Court is vacated, and the case is remanded to that court, with instruction to dismiss the bill; the appellant recovers costs in both courts.