DEHYDRATORS, LIMITED, et al. v. PETROLITE CORPORATION, LIMITED.

No. 9547.

Circuit Court of Appeals, Ninth Circuit.

Jan. 6, 1941.

H. Calvin White, of Los Angeles, Cal., for appellant.

Leonard S. Lyon and Irwin L. Fuller, both of Los Angeles, Cal., for appellee.

Before WILBUR, DENMAN, and MATHEWS, Circuit Judges.

WILBUR, Circuit Judge.

This is a suit for infringement of the patent which was held valid by this court in Research Products Co. et al. v. Tretolite Corp., 9 Cir., 106 F.2d 530. This patent covered the process of treating emulsified petroleum oil with a commercial product of variable chemical characteristics covered by the trade-name "Turkey Red Oil". The Petrolite Corporation, successor in interest of the Tretolite Company, owns the patent and manufactures turkey red oil of varying characteristics, which it sells under the name of "Tret-O-Lite", to be used in the patented process. It makes no specific royalty charge for the use of the patented process but by notice attached to the container in which the Tret-O-Lite is sold authorizes the purchaser to use the same for demulsifying petroleum oil in accordance with the patented process.

The Dehydrators, Ltd., and Nobs Dehydrating Corporation, appellants, are engaged in the manufacture and sale of turkey red oil for use by the purchaser in demulsifying petroleum oil according to the patented process. These two appellants were charged with contributory infringement and the appellant Italo Petroleum Corporation of America is charged with using the patented process in the demulsification of petroleum oil. The facts were stipulated and submitted to a special master for his conclusion thereon. He adopted the agreed statement of facts as findings and made his conclusions of law thereon which were confirmed and adopted by the District Court over the exceptions of the appellants. The appellants admit the charge of infringement but by way of defense plead and contend that the patented process has been used by the appellee and its predecessor for the purpose of securing a limited monopoly in the sale of turkey red oil, for the purposes of practicing the invented process, in violation of the law as laid down by the decision of the Supreme Court in Carbice Corporation of America v. American Patents Development Corporation, 283 U. S. 27, 51 S.Ct. 334, 75 L.Ed. 819, and Leitch Mfg. Co. v. Barber Mfg. Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371.

For convenience we will refer to the Petrolite Corporation, Ltd., and its predecessors, as "the appellee".

The special master held that up to September 1933, the method of doing business by the appellee tended to secure to it a limited monopoly in the sale of turkey red oil for use as a petroleum demulsifier in violation of the law as declared in the decisions of the Supreme Court, Carbice Corporation v. American Patents Development Corp., and Leitch Mfg. Co. v. Barber Mfg. Co., supra. This ruling is acquiesced in by appellee and need not be further considered.

Beginning in September 1933, and until May 1938, the containers, fifty-gallon drums, in which the appellee sold Tret-O-Lite, had affixed thereto an offer to the public of an unlimited license to use the patent here involved, as well as 86 other patents, as follows:

"The royalty fee charged by The Tretolite Company for above license shall be 1¢ (one cent) for each 42 gallon barrel of pipe line oil recovered by the licensee from wet, roily or emulsified oil. The minimum fee to The Tretolite Company for said royalty shall be not less than $100.00 (one hundred dollars) per annum for each well producing wet, roily or emulsified oil and shall be paid to The Tretolite Company by the licensee yearly in advance. In addition to the above royalty fee, The Tretolite Company shall also charge such licensee and such licensee shall pay The Tretolite Company a reasonable sum to cover the expense of accounting, auditing, inspection, supervision, service, etc., to be known as a service fee. The minimum service fee shall be $20.00 (twenty dollars) per annum for each well producing wet, roily or emulsified oil and shall be paid by the licensee yearly in advance.

"Such unlimited licensee may purchase the demulsifying agent, used by him or it in practicing any of said patented processes, from any source whatsoever, or may make the same himself. The Tretolite Company, however, assumes no responsibility whatsoever in respect to any demulsifying agent, used by such licensee in practicing the process of any of its said letters patent, other than Tret-O-Lite (the demulsifying agent made and sold by The Tretolite Company)."

From May 1938 to October 1939 the offer of the unlimited license to use of two hundred fourteen patents was tendered in the following provision of the notice attached to the container in which Tretolite was sold by the appellee: "At its option the purchaser may obtain a license from The Tretolite Company on reasonable

terms, permitting the purchaser to employ any or all of the aforesaid Letters Patent in the use of any demulsifying agent not made or sold by The Tretolite Company. Application for such a license should be made in writing to the main office of The Tretolite Company at 937 Pacific Avenue (Webster Groves Station), St. Louis, Missouri."

In October 1939, until the expiration of the patent in September 1940, the notice was substantially the same, substituting for the words "not made or sold by Tretolite Company" the words "obtained by the purchaser from any source", and adding sixteen more patents, making two hundred thirty in all, whose numbers are given in the notice.

The stipulation of facts states that: "The terms under which plaintiff and its predecessors have been and are willing to extend such licenses under the patent in suit are such that the treating cost to the oil company would be the same whether the oil company purchased 'Tret-O-Lite' or procured the chemical elsewhere, i. e., the payment by the oil company of a royalty equal to the difference between the cost of turkey red oil on the open market and the sales price of 'Tret-O-Lite' ".

It is also stipulated that: "Plaintiff and its predecessors in interest, beginning with the use of Exhibit B [September 1933] have offered a license to any oil producer to use the patented process of the Letters Patent in suit upon reasonable terms and to employ in the practice thereof any chemical reagent by whomsoever manufactured or sold. Plaintiff and its predecessors in interest have never refused, and plaintiff does not now refuse, to grant a license to any oil producer upon reasonable terms to practice the patented method of the Letters Patent in suit and to employ in the practice thereof any chemical reagent by whomsoever manufactured or sold."

The special master, in his conclusions of law, said: "There is nothing to show that the royalty fee asked was not reasonable or that the arrangement offered tended to extend the plaintiff's monopoly. The same is true of plaintiff's policy from May, 1938 to date. In this period competitors in the turkey red oil market are placed at no disadvantage as to selling price."

■■ The basic question involved in the case is whether or not the patentee is using the patent for the purpose of obtaining a limited monopoly in a well-known article of commerce. If he is doing so he cannot maintain an action upon the patent either against the person furnishing such commercial article to the user of the patented process or against the user himself. The liability of the contributory infringer is commensurate with that of the infringer himself.

The appellants call attention to the burden to the user of turkey red oil involved in the procurement of an unlimited license described in Exhibit B, supra. If we follow the recent decision of the Circuit Court of Appeals for the Third Circuit in Barber Asphalt Corp. et al. v. La Fera Grecco Contracting Co., 116 F.2d 211, decided September 20, rehearing denied December 4, 1940, we must hold that the proposed licensing agreement contained in Exhibit B, supra, is so onerous as to prevent the free competition in turkey red oil for use in the patented process as to come within the law against monopolistic practices by a patentee as declared by the Supreme Court in Leitch Mfg. Co. v. Barber Mfg. Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371, supra. The Circuit Court of Appeals for the Third Circuit, in Barber Asphalt Co. v. La Fera Grecco Contracting Co., supra, held that if the owner of a patented process for curing freshly poured concrete by covering the wet concrete with a thin coating of emulsified asphalt, sells its emulsified asphalt product to its purchasers for a royalty of 2 cents per gallon over the market price, and gives to the purchaser a right to use the patented process, while requiring the users of emulsified asphalt purchased from other sources to pay a royalty of 1 cent per square yard of concrete surface over which the emulsified asphalt is spread, he puts such a burden upon the user of emulsified asphalt purchased from other sources as prevents free competition and effects a limited monopoly for emulsified asphalt used for practicing the patented process and cannot recover for the infringement of his patent. The decision of that court is largely based upon the impossibility of equalizing the royalty of 2 cents per gallon paid by the purchasers of the patentee's product and that required for the use of the process by those who have purchased the emulsified asphalt elsewhere, because of the fact that a gallon of the asphalt emulsion might be spread over a surface varying from 5 to 20 square yards in practicing the patented process. Conse-

quently, if the product purchased from others were used economically by the purchaser so as to cover 15 or 20 yards of concrete, the license fee required would be so great that he could not afford to purchase the product from anyone other than the patentee. In that regard the court said: "The contractor who does not purchase his emulsions through the Johnson-March Thompson middleman channel is faced with the economic anomaly that upon spreading his emulsions sparingly his cost is increased; thickly, the cost is reduced." Upon rehearing, the Court adhered to its former position (opinion handed down December 4, 1940). A majority of the members of the court concluded that even if the royalty of 2 cents per gallon did not materially differ in amount from the royalty under the proposal of 1 cent per square yard of concrete, nevertheless the patent had been used as a means of maintaining a limited monopoly in the sale of a bituminous emulsion. In its opinion denying a rehearing (December 4, 1940, supra) the court said: "We conclude that this is so because of the uncertainty of cost imposed upon a contractor who buys bituminous emulsion from others than Johnson-March or Thompson and spreads it in accordance with the teaching of the patent. The prices of Johnson-March or Thompson, with the royalty included, save the purchaser from the uncertainty of the charge for royalties computed upon the number of gallons of material used."

In the case at bar the disparity between the situation of the purchaser of turkey red oil from the appellee and the purchase from others with reference to use of patent process, is much greater than in the case before the Third Circuit Court of Appeals. In the case at bar we have, on the one hand, a fixed price dependent upon the amount of turkey red oil purchased and carrying with it the right to use the oil so purchased in the patented process for demulsifying petroleum emulsion. On the other hand, the one who purchases his turkey red oil from another source must pay a royalty based upon the amount of petroleum recovery resulting from the use of the turkey red oil so purchased. This can only be determined after purchase and use.

The appellee contends that its great success in the sale of turkey red oil has largely resulted from the skill of its chemists in preparing and using a turkey red oil of the proper chemical characteristics for the particular petroleum emulsion processed. In this connection it is emphasized that there are several hundred combinations of chemical ingredients covered by the named turkey red oils and that great chemical skill and knowledge is required for the selection of the particular composition of turkey red oil which is most effective for use in treating a particular petroleum emulsion. In addition to this disparity of price and the uncertainty therein, there is a requirement that the application for the unlimited license under the patent must pay a set annual fee of $120 in advance for each well producing the petroleum emulsion treated by the process.

█ We hold that the proposed unlimited license offered by Exhibit B from September 1933 to May 1938 was not the equivalent of the limited license resulting from purchase of the appellee's produce, and results in an unlawful partial monopoly in turkey red oil for use in the patented process. As we have stated, however, the parties stipulated that the offer of the unlimited license was upon reasonable terms, but this fact does not overcome the difficulty that the patentee is actually using the patent to force the purchase of its product. The stipulation that the proposed royalty is a reasonable one does not aid in overcoming the disparity between the two systems of licensing the users of the process between 1933 and 1938.

We next consider the period from 1938 to the expiration of the patent. The offer of the company for that period is contained in two different notices, one of May 1938, operative until October 1939, and one of October 1939, operative until the patent expired in 1940. The relevant portions of these notices are quoted above. The license was to issue upon "reasonable terms", to be stated in response to a written application therefor. According to the stipulation the terms of the proposed offer, which the patentee was willing to make in response to such application, required the purchasers of turkey red oil from other sources to pay to the patent owner as a royalty the difference between the cost on the open market of turkey red oil and the sale price of Tret-O-Lite sold the appellee. Assuming that this plan would merely require the purchaser from other sources to pay an amount equivalent to that he would have been required to pay to the owner of the patent for the same

product, that is, that the treating cost to the Oil Company would be the same in each case, it does not follow that this apparent equality would meet the charge of a monopolistic practice, if the purpose of such a plan and its obvious tendency would be to give to the appellee a monopoly in the sale of turkey red oil for use in the patented process. The stipulation does not indicate, and, consequently, it is not apparent upon what open market the cost is to be ascertained, nor what sale price of the appellee's produce is to be taken as the standard. Thus, the proposed unlimited royalty is subject to two variable quantities, one, that of the market price of turkey red oil, the other, the sale price of the appellee's Tretolite. We may assume that the market price is not controlled by the appellee although it is a large manufacturer of turkey red oil. However, it is clear that the price at which the appellee will sell its product at any given time is entirely within its power. While it is true that for some purposes a market price is deemed to be reasonably certain because susceptible of proof, it is none the less true that evidence upon the subject may be contradictory and the result uncertain until determined by the court. The other variable factor depends upon the action of the appellee. If the appellee had been more interested in promoting or exploiting its patent than in selling its Tret-O-Lite it would have been a very simple matter to fix a royalty fee of so many cents per gallon whether purchased from the appellee or from outsiders. Indeed, no other course on the part of a patentee who is selling a commercial product to use in the patented process he owns would seem to quite meet the claim that the practice of combining the price of a royalty and of the product in the same unit without separation tends to promote a monopoly in the product if the patent monopoly is not waived.

We conclude that the offer of license rights made by the appellee in 1938 and 1939, as well as in 1933, tends to promote an illegal monopoly in the sale of turkey red oil by it for practicing the patented process. It follows from what we have said that the various changes made by the appellee in its method of doing business are insufficient to obviate the fact that the patent monopoly for a process has been used by the appellee for the purpose of securing to it a partial monopoly in a commercial product in violation of law.

The practice comes within the condemnation of decisions by the Supreme Court to which we have referred (Carbice Corporation of America v. American Patents Development Corp., and Leitch Mfg. Co. v. Barber Mfg. Co., supra) and precludes recovery herein by the appellee. In view of our conclusion it is unnecessary to consider the other questions advanced by the appellants and appellee.

Judgment reversed with instructions to the trial court to enter judgment in favor of the appellants.