**B. B. CHEMICAL CO. v. ELLIS et al.**

No. 3626.

Circuit Court of Appeals, First Circuit.

Feb. 21, 1941.

Harrison F. Lyman, of Boston, Mass. (C. E. Hammett, Jr., A. D. Salinger, and Fish, Richardson & Neave, all of Boston, Mass., on the brief), for appellant.

. William Gates, Jr., of Boston, Mass. (James R. Hodder and Roberts, Cushman & Woodberry, all of Boston, Mass., on the brief), for appellees.

Before MAGRUDER and MAHONEY, Circuit Judges, and HARTIGAN, District Judge.

MAHONEY, Circuit Judge.

The appeal in this case is from the final decree of the District Court dismissing the bill of complaint in a suit brought to restrain the defendant from infringing patent No. 1,830,428. The patent was applied for by the defendant, Elmer A. Ellis, November 8, 1929, and the application was assigned to the plaintiff for $8,000. On November 3, 1931, the patent was issued pursuant to the application and is now owned by the plaintiff.

The defendants are Elmer A. Ellis, the inventor of the patented process and the plaintiff's assignor, and the Magic Tape Company. The latter is a corporation with outstanding capital stock of twenty-five shares, of which the defendant Ellis and his wife own twenty-four. The defendants are charged with infringing the plaintiff's patent by selling materials to shoe manufacturers for use in an allegedly infringing process.

The patent relates to the manufacture of insoles for shoes. The specification de-

scribes the usual practices which formerly had been followed by shoe manufacturers in reinforcing the insoles. By the so-called "hot process", insoles were reinforced by cementing to them a textile fabric such as "gem" duck which had been coated with a thermoplastic material containing gutta percha or gutta siak and cut into strips of approximately the width of the insoles. To insure the proper adhesion of the fabric to the insole, this coat of thermoplastic material had to be heated to a very high temperature just prior to its application to the insole. The disadvantages of this process were that it had to be used while the coating was still hot and pliable and was difficult and dangerous for the operator to use.

The process known as the "cold process" consisted of the application to a strip of duck of a coating of ordinary fluid rubber cement containing a large proportion of solvent. In order for the coating to become tacky, i. e. sticky, and thus suitable for use, the strips were hung up in the factory to allow the solvent to evaporate. This took up a great deal of factory space and consumed an impracticable amount of time. Attempts to use a permanently tacky coating such as a surgeon's adhesive plaster were also unsuccessful as the strip, when coated, could not be rolled without sticking.

It was to overcome the disadvantages of these earlier processes that the defendant Ellis developed the process of the patent in suit. Claim 4 of the patent, the only claim in issue, is set forth in the margin.[1] In this process, a suitable fabric, such as "gem duck" is coated in the web with a cold rubber cement composition containing rubber, a resin and a solvent, and capable of being rendered permanently non-tacky upon evaporation of the solvent and consequent drying of the coating. The web is then heated to evaporate the solvent, thus rendering the coating non-tacky, and the web is cut into strips and wound into rolls which, because the cement is non-tacky, can be easily unwound. Just before the strip is applied to the insole in the reinforcing operation, a second, or top coat of rubber cement is applied to this pre-coated material. The absorption of this top coat by the pre-coated material and the evaporation of the solvent form a single reinforcing material which immediately adheres to the insole, at room temperature, and forms a satisfactory bond. The main improvement was the elimination of heat as a necessity in the reinforcing of insoles and the use of evaporation of cold, highly volatile rubber solvents of a tack-producing ingredient which permitted immediate use in reinforcing insoles when applied to a pre-coated fabric.

Claim 4 does not include specific reference to ingredients in its base or top coat. It provides only for a cement "having a substantial rubber content" and a top coat "containing a relatively high amount of rubber" with the proper adhesive qualities at room temperature. However, the specification suggested that a "suitable cement" for the base coat would contain rubber, zinc oxide as a filler, and a resinous material such as Burgundy pitch, the rubber and resin being dissolved in naphtha. The suggested top coat consists essentially of the same materials but in different proportions.

Between 1929 and 1932, the plaintiff used the above formula. Since 1932 it has used a pre-coat and has supplied to shoe manufacturers a top coat which includes a certain percentage of 60 per cent concentrated latex and other ingredients, the rubber content of the respective coats being about 35 per cent of the whole.

The plaintiff's manner of conducting its business was to supply shoe manufacturers with the pre-coated duck in strips of suitable width; if desired, the manufacturers supplied the duck and the plaintiff pre-coated and slit it. The plaintiff also supplied the adhesive top coat to be applied to the pre-coated fabric at the shoe factory, just prior to the application of the reinforcing material to the insole. The plaintiff further supplied its own patented machines suitable for use in applying the adhesive to the pre-coated duck, such machines being and remaining the property of the plaintiff. The plaintiff instructed the machine operators, serviced the machines, and advised and assisted in the reinforcing operations. As compensation for the foregoing, the

---

[1] "4. That improvement in methods of reinforcing insoles which comprises applying, at room temperature, to a strip of reinforcing material provided with a dry coating of a cement having a substantial rubber content, a coating of adhesive containing a relatively large amount of rubber and of such a character that it will be effective even when freshly applied to cause quick adhesion of the reinforcing material and the material of the insole, and applying to each other, still at room temperature, a portion of the coated strip and the insole to be reinforced."

plaintiff made a single charge to the shoe manufacturer, at a rate per web yard of duck supplied to the manufacturer; and, if the manufacturer did not furnish the duck, the price of that material was added to the charge. The adhesives used by the plaintiff in pre-coating have all had a large rubber content but were made according to different formulae, with special reference to the purpose for which the material was to be used. The plaintiff did not grant written licenses to shoe manufacturers to use its process, nor was any such license ever requested. Neither by notice nor agreement in any form with its customers did the plaintiff require them to use only the plaintiff's material. The plaintiff adopted the foregoing method of utilizing the patented process because it deemed it the most practical.

In 1932, the plaintiff gave to the Pepperell Manufacturing Company and to the H-B Products Company licenses to use the patented process on machines and materials using a latex or non-solvent top coat, at room temperature. The commercial practice of these licensees is substantially identical with that of the plaintiff.

In 1938 the defendant Ellis began to develop and promote a process for reinforcing insoles. The course of business adopted by his corporation followed closely that of the plaintiff.

The price per yard charged by the defendant, however, was somewhat lower than the plaintiff's price. In the machines which the defendants furnished their customers, there was a heating unit ostensibly to heat the latex solution which was used as a top coat. The District Judge found that with the 60 watt unit in use prior to the suit, the temperature of the latex solution when applied to the pre-coated fabric was not above room temperature. Since the suit was brought, a larger unit was installed, and higher temperatures were obtained. But at no time did the temperature approach 200 degrees Fahrenheit, necessary in the old hot process. The machines which the defendant loaned to its customers bore a plate stating that the process required the emulsion used to be kept at a heat of about 120 degrees. The trial judge found as a matter of practice, there was no pretense of maintaining this temperature.

The defendants' process is essentially like that of the plaintiff. The adhesive applied in pre-coating the duck follows closely the suggested formula in the plaintiff's specification. The defendants' top coat contains approximately 60 degrees concentrated latex and certain other ingredients. The defendants contend that their latex adhesives do not respond to the terms of claim 4, if that claim is properly limited, since latex is a colloidal dispersion in water while rubber cement is a colloidal dispersion in rubber solvent. It is agreed that both are adhesives, and the defendants' expert testified that they were certainly equivalents. It was conceded that both the latex and the rubber cement developed adhesion as the liquid vehicle evaporated. There was evidence to show that rubber in solvent as described in the patent co-acts in some way with the base coat but not exactly the same way as with the latex top coat, though the final result would be quite similar. The adhesive powers of the twice coated fabric in either case are due to evaporation and absorption of the liquid.

The defendants claim that their process does not infringe that of the plaintiff since their latex formula for the top coat is dissimilar to the rubber cement suggested in the specification and because heat is required in their process. During the trial the parties conducted tests using the defendants' process. It was found that no substantial benefit was derived from the use of heat and that the defendants' process worked satisfactorily at room temperature.

The District Court found that defendants' process infringed that of the plaintiff because the latex top coat was equivalent to that suggested in the patent and because the terms of claim 4 permit the use of equivalent means. It further held that the defendants were infringers, but that the plaintiff was prevented from recovering because of its method of exploiting its patent. It therefore ordered the complaint dismissed.

■ In order to dispose of this case, the court must decide, first, whether the defendants' process infringes the plaintiff's process; second, whether, if so, the defendants are infringers, direct or contributory; and third, whether the plaintiff by its method of doing business will be denied relief against the defendants, providing the latter are determined to be infringers. No question of the validity of the plaintiff's patent is here involved. The defendants admitted its validity, and Mr. Ellis, being the plaintiff's assignor, would be estopped to deny it. Westinghouse Co. v. Formica Co., 1924, 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316.

We think it plain that the defendants' process infringes that of the plaintiff, as set forth in claim 4. The claim is very broad, and the granting of the patent allows the plaintiff the exclusive right to use, or license others to use, the process of reinforcing insoles by applying at room temperature to a strip of dry reinforcing material previously coated with a rubber cement, a coating of rubber adhesive which will cause quick adhesion of the reinforcing material and the insole, and applying, at room temperature, the insole to the strip of reinforcement material so coated. Claim 4 is in no way restricted as to the formulae for making the two coatings. The claim is the measure of the grant. Smith v. Snow, 1935, 294 U.S. 1, 55 S.Ct. 279, 79 L. Ed. 721. The patent sets forth the specification for "suitable" mixtures just as many patents suggest preferred methods or machines. But a patentee is in no sense limited to these illustrative specifications. If the contrary were true, a patent, particularly of a process, would be of little value. Continental Paper Bag Co. v. Eastern Paper Bag Co., 1908, 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122; Tilghman v. Proctor, 1880, 102 U.S. 707, 728, 26 L.Ed. 279; Moore Filter Co. v. Tonopah-Belmont Development Co., 3 Cir., 1912, 201 F. 532, 541. The defendants' pre-coat and top coat fall precisely within the broad scope of claim 4. The pre-coat follows closely the preferred formula of the specification. The defendants claim that the use of latex instead of rubber dispersed in a volatile solvent for the top coat differentiates their process from that of the plaintiff. We do not agree. Latex is a rubber substance, and it is a substantial equivalent for the preferred formula in the patent. The process of evaporation and absorption at room temperature is the same for each though the chemical reactions may not be identical. The terms of claim 4 are broad and cover the use of equivalent means to secure the desired reaction. Since the patentee is not limited to the "suitable" mixture suggested, the defendants' use of the latex formula does not avoid infringement. Continental Paper Bag Co. v. Eastern Paper Bag Co., supra; Mowry v. Whitney, 1871, 14 Wall. 620, 648, 20 L.Ed. 860; Nachman Spring-Filled Corp. v. Spring Products Corp., 2 Cir., 1934, 68 F.2d 829; Moore Filter Co. v. Tonopah-Belmont Development Co., supra.

The other factor upon which the defendants rely as showing that their process does not infringe that of the plaintiff is the provision that the latex solution should be heated. However, the evidence and the inter partes test made conclusively showed that heat was not necessary to the defendants' process. The process could be and frequently was performed without heat. The same results were reached when the latex was at room temperature. The introduction of heat was not necessary to a satisfactory bond or quick adhesion. Even if it had been shown that heat somewhat improved the process, the charge of infringement would not be escaped. Tilghman v. Proctor, supra. The defendants use the principle and appropriate the substance of the claim in issue, and the fact that they avoided the letter of the claim by the addition of the unnecessary element of heat does not prevent infringement. Boyden Power-Brake Co. v. Westinghouse, 1898, 170 U.S. 537, 568, 18 S.Ct. 707, 42 L.Ed. 1136; Vortex Mfg. Co. v. Ply-Rite Contracting Co., D.C., D.Md.1929, 33 F.2d 302. The defendants' process is within claim 4 and infringes it.

It is, therefore, necessary to decide whether the defendants are infringers of the plaintiff's claim, and if so, whether they are direct or contributory infringers. To be direct infringers, the defendants must have used the plaintiff's process. Moore-Filter Co. v. Tonopah-Belmont Development Co., supra. There is no evidence that they have done so or are doing so. They sell rolls of duck cut in strips pre-coated with a dry rubber cement, and they sell the liquid to be used as a top coat. The plaintiff has no patent on either of these things. It simply has a patent on their use in a particular way for a particular purpose. In pre-coating the duck and procuring the top coat from others, the defendants are completely within their rights. They are in no way using the plaintiff's process. The defendants also supply to their customers a machine which applies the adhesive top coat to the pre-coated duck. The use of this machine, without a license from the plaintiff, in carrying out the plaintiff's process (or the infringing process of the defendants) would be a direct infringement of the plaintiff's claim. But the defendants do not use the machine. They merely supply it for use by shoe manufacturers. The manufacture of the machine by the defendants is not an infringement of the plaintiff's *process* patent. The plaintiff has a *machine* patent on the machine which it supplies to its customers

for using its process. It may be that the defendants' machine infringes this patent, and the plaintiff may test its rights by suit for ordinary infringement of that patent. Philad Co. v. Lechler Laboratories, 2 Cir., 1939, 107 F.2d 747. But even such infringement would not constitute the defendants direct infringers in this case. "So distinctively [sic] and separate in the patent law are process and apparatus for utilizing such process that where, after a patent for a process by one inventor, a second inventor might patent a novel apparatus for utilizing the process, the situation would arise that the inventor of the process could not employ his process in such machine without license from the machine patentee, and the latter could not use the process in his machine without license from the process patentee. It will therefore be evident that the test of process infringement is not the similarity of apparatus, but rather whether the apparatus, no matter what its form, utilizes the process." Moore Filter Co. v. Tonopah-Belmont Development Co., supra, 201 F. at 541, 542. The defendants are clearly not direct infringers of the plaintiff's process patent.

However, the defendants manufacture and sell materials for use in an infringing operation with knowledge that they will be so used. They induce their customers to use such infringing processes and indirectly receive their profit from such infringing use. There can be no doubt that they are contributory infringers. Individual Drinking Cup Co. v. Errett, 2 Cir., 1924, 297 F. 733. Though there is some confusion on the point, we understand the District Judge to have reached the same conclusion. His second conclusion of law is that both defendants are guilty of infringement of claim 4. It is to be noted that he does not say "direct" infringement. The third conclusion of law states that the plaintiff is not entitled to maintain this suit "for contributory infringement". [32 F.Supp. 690, 696.] We believe the District Judge was correct. The defendants are contributory infringers, and the plaintiff's argument that they are direct infringers cannot prevail.

Since the defendants are contributory infringers only, it is obvious that in the light of the decided cases the plaintiff is not entitled to recover. The plaintiff's course of business is precisely that of the patentee in Leitch Mfg. Co. v. Barber Co., 1938, 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed.

371. The defendants are in a situation similar to the vendor of the emulsion in that case. The plaintiff by granting implied licenses only to those who buy unpatented materials from it has brought itself squarely within the language of the Leitch case and Carbice Corporation v. American Patents Development Corp., 1931, 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819. In the former case [302 U.S. 458, 58 S.Ct. 290, 82 L.Ed. 371], the court declared the rule to be that a patentee doing business in the manner of the plaintiff would be denied relief against such contributory infringers as the defendants "on the broad ground that the owner of the patent monopoly, ignoring the limitation 'inherent in the patent grant,' sought by its method of doing business to extend the monopoly to unpatented material used in practicing the invention. By the rule there declared every use of a patent as a means of obtaining a limited monopoly of unpatented material is prohibited. It applies whether the patent be for a machine, a product, or a process". Clearly, this must conclude the case. Autographic Register Co. v. Sturgis Register Co., 6 Cir., 1940, 110 F.2d 883; Philad Co. v. Lechler Laboratories, supra; J. C. Ferguson Mfg. Works v. American Lecithin Co., 1 Cir., 1938, 94 F.2d 729. See Note, (1938) 52 Harv.L.Rev. 308, 313.

The plaintiff seeks to prevent the application of this rule to this case by limiting the doctrine to those situations in which the alleged contributory infringer supplies staple articles of commerce. It insists that where the articles supplied are specially manufactured for use in this particular process, relief is not to be denied the patentee no matter what his course of business. It points to dry ice, bituminous emulsion, and lecithin as such staple articles. It relies upon our decision in J. C. Ferguson Mfg. Works v. American Lecithin Co., supra, and that of the Ninth Circuit in Johnson Co. v. Philad Co., 1938, 96 F.2d 442, in support of this proposition. In the Ferguson case [94 F.2d 731], we said that a process patent could not be extended "to monopolize the sale of unpatented staple material, used in such product, process, or composition." We do not consider that to have been intended as a limitation upon the doctrine of the Leitch and Carbice cases. The language of those cases is extremely comprehensive and is by no means restricted to staple articles. Lecithin being a staple material there was no necessity for this court to have passed on whether the

doctrine applied to other than staple materials, and we do not believe it did so. There is every indication that the Carbice and Leitch cases apply to specially designed non-patented articles. See International Business Machines Corp. v. United States, 1936, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085; Autographic Register Co. v. Sturgis Register Co., supra; Oxford Varnish Co. v. Ault & Wiborg Corp., 6 Cir., 1936, 83 F.2d 764; Alemite Corp. v. Lubrair Corp., 1 Cir., 1933, 62 F.2d 899. We agree with the opinion of the Second Circuit in Philad Co. v. Lechler Laboratories, supra, that the emphasis is on the fact that the articles sold by the alleged contributory infringers were not covered by the plaintiff's patent although it conducted its business as though they were. For this reason we cannot agree with the limitation expressed in Johnson Co. v. Philad Co., supra.

██ The plaintiff further argues that its present method of doing business is the only practicable way to exploit its patent and that it should not be penalized for its necessary effect. The trial judge expressed himself as unimpressed by this contention, and we agree with his conclusion. It is no doubt true that the shoe manufacturers prefer to procure the pre-coated duck, the material for the top coat, and the machines for using the plaintiff's process from a central source. It is also likely that they wish to perform the process as required in their own factories. It would be perfectly practicable for the plaintiff to grant licenses for the use of its process at a yearly fee, or a royalty based on the number of yards of pre-coated duck or the number of gallons of top coat used, or any other suitable measure. In that way the plaintiff can exploit the patent monopoly, and only the patent monopoly, while leaving the manufacturer free to buy the unpatented materials wherever it is to his best advantage to do so. Such an arrangement would cause little variation in the plaintiff's method of doing business while effectively preventing the extension of a limited monopoly to unpatented materials.

██ The plaintiff's difficulty appears to be that it misconceives its patent rights under claim 4. It has no right to prevent anyone from pre-coating a reinforcing fabric for insoles with a cold rubber cement, slitting it and rolling it into rolls. It has no right to prevent anyone preparing and selling an adhesive top coat with a substantial rubber content which will adhere at room temperature to the insole and the reinforcing material. It has no right, under claim 4 of the patent here in suit, to prevent anyone from making machines to utilize its process. Mowry v. Whitney, supra, 14 Wall. at 652, 20 L.Ed. 860; Moore Filter Co. v. Tonopah-Belmont Development Co., supra. All that the plaintiff is entitled to do is to prevent any unlicensed person from combining these materials in the patented process or in aiding indirectly in such infringement. Because of its course of business, the plaintiff is denied relief even against such contributory infringement as the furnishing of unpatented articles with the knowledge that they will be utilized in an infringing process.

██ It has been suggested that the practice of the plaintiff in granting limited licenses to the Pepperell Mfg. Co. and the H-B Products Co. to make, use and sell pre-coated reinforcing fabric for latex or non-solvent top coating shows that it is properly exploiting its patent. The business practice of the licensees is the same as the plaintiffs. By purchasing their pre-coated material the manufacturers get an implied license to use the plaintiff's process. We do not believe that the introduction of a middleman licensed by the patentee and practicing the business methods condemned by the Leitch case, through which the plaintiff directly benefits from royalties, can save the plaintiff from the application of the doctrine. An examination of the facts in several of the cases shows that similar arrangements were of no avail. See Leitch Mfg. Co. v. Barber Co., supra, 302 U.S. at 460, note 2, 58 S.Ct. 288, 82 L.Ed. 371; Barber Asphalt Corp. v. La Fera Grecco Contracting Co., 3 Cir., Sept. 20, 1940, 116 F.2d 211, reversing, D.C., D.N.J.1939, 30 F. Supp. 497.

The defendants' process infringes the plaintiff's patent, but the plaintiff is denied relief against the defendants as contributory infringers because it exploits its patent primarily as a means of suppressing competition in unpatented materials used in connection with it. The District Judge was correct in dismissing the complaint.

The decree of the District Court is affirmed with costs to the appellees.

MAGRUDER, Circuit Judge (concurring).

I agree that the defendants have infringed the plaintiff's patented process, for the reasons stated by Judge Mahoney. Yet

denial of equitable relief in the circumstances disclosed is amply supported by authority, and I concur in the result reached by the court.

It is not clear to me, however, that the case depends upon any distinction between direct and contributory infringement. This distinction is often a shadowy one, as it is in the case at bar. The defendants have certainly participated more directly and intimately in the infringing process than did the defendant in Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371, where all it did was to sell to road contractors a staple unpatented article (bituminous emulsion) with knowledge that a small proportion of it would be used by the infringing contractors in practicing the patented process. Here the defendants are engaged in actively inducing unlicensed shoe manufacturers to practice the process. They furnish to such manufacturers the machines, the pre-coated duck and the adhesive top coat, all especially designed and prepared for this particular use, and, in addition, they furnish "instruction to operators, servicing of machines, and advice and assistance in reinforcing operations." Certainly, if the shoe manufacturers as direct infringers would be liable to the plaintiff, ordinary principles of tort liability would require us to hold the defendants liable as joint tortfeasors.

But in my opinion the doctrine of the Leitch case gives immunity to the direct infringer as well as to one who might be called a contributory infringer. It would be a solemn farce to hold that the seller of the unpatented article cannot be enjoined from making the sale to the direct infringer for use in the process, but that the direct infringer may be enjoined from practicing the process. If the plaintiff in the Leitch case could have got an injunction against any infringing road contractors who purchased bituminous emulsion from anybody other than the plaintiff, the defendant would have been quite as effectively choked off from selling this unpatented article for use in the process as if the injunction had run against the defendant itself. But the whole purpose of the doctrine laid down in the Leitch case was to thwart "every use of a patent as a means of obtaining a limited monopoly of unpatented material." 302 U.S. at 463, 58 S.Ct. at 290, 82 L.Ed. 371. Accordingly, I think that American Lecithin Co. v. Warfield Co., 7 Cir., 105 F.2d 207, made a correct deduction from the Leitch case in holding that it gave immunity to a direct infringer as well as to a contributory infringer. It may be noted that this case was cited with approval in Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 459, 60 S.Ct. 618, 84 L.Ed. 852. And I see nothing in the reasoning or the language of the Leitch case to indicate that it applies only to the sale of "staple" unpatented articles. Philad Co. v. Lechler Laboratories, 2 Cir., 107 F.2d 747, 748. See Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 459, 60 S.Ct. 618, 84 L.Ed. 852.

This does not mean that the patentee suffers a forfeiture of its patent rights because of objectionable practices in exploiting the patent, but merely that the patentee is disabled from obtaining legal redress for infringements while such practices continue. There is no present need to inquire how far the doctrine of the Leitch case squares with earlier lower court holdings that violation of the anti-trust laws by a patentee is no defense to a suit for patent infringement. See Brown Saddle Co. v. Troxel, C.C., 98 F. 620; Radio Corp. of America v. Majestic Distributors, D.C., 53 F.2d 641; Buck v. Newsreel, Inc., D.C., 25 F.Supp. 787.

Presumably there is a maximum cost for reinforced insoles prepared by the patented process beyond which shoe manufacturers would find it uneconomic to utilize the process. That maximum cost would include, among other elements, the patentee's charge for practicing the process, and also the profits to the suppliers of the unpatented materials used with the process. If the patentee is not also engaged in supplying the materials, he must fix the royalty at a point which permits a reasonable profit to suppliers furnishing materials to the shoe manufacturer and at the same time does not make it uneconomic for the shoe manufacturer to utilize the patented reinforcing process. Otherwise the patentee would make no headway in marketing the process. There is thus a definite limit to the profit a patentee can realize by the simple exploitation of the patent monopoly in this way.

But the patentee, in addition to realizing the maximum profit obtainable merely from licensing the process, may want to profit by the sale of unpatented materials used by the licensee. This is a legitimate object. However, the doctrine of the Leitch case is that the patentee may not utilize the leverage of the patent monopoly to achieve a limited monopoly of the sale of the unpatented materials. If the shoe manufacturer is in the market for the purchase of

unpatented materials, it must be a fair field and no favor as between the patentee and its competitors in the sale of those articles.

The practical question then is presented, how the plaintiff in the case at bar could legitimately have proceeded to exploit its patent monopoly.

(1) The plaintiff could have laid the patent "on the shelf" and neither practiced the process itself nor licensed others to do so. In this event, the plaintiff could have got an injunction against any direct or contributory infringer. ·

(2) The plaintiff might without licensing anyone have practiced the patented process itself in its own plants and sold to shoe manufacturers the reinforced insoles ready for insertion in the shoes. This of course would have excluded the defendants from manufacturing and selling the unpatented pre-coated duck and the top coat for use in connection with the patented process. It might have enabled the plaintiff to make a profit in excess of the maximum profit that could have been derived merely from licensing the process, since the price of the reinforced insoles to shoe manufacturers would include a reasonable profit on the pre-coated duck and top coat supplied by the patentee. However, the record is clear that for many reasons it happened not to be feasible for the plaintiff to follow this perfectly legitimate method of exploiting the patent. As a practical matter the final reinforcement of the insoles, in accordance with the patented process, must be done in the shoe factories.

(3) The plaintiff might have licensed shoe manufacturers to use the process on a royalty basis. It appears that the shoe manufacturers probably would not want to bother with the preliminary steps of preparing the pre-coated duck. But under this alternative there would be nothing to prevent the shoe manufacturers from buying the unpatented materials where they pleased, that is, the pre-coated duck and the top coat. They could buy these materials from the plaintiff or from the defendants or from any other competitor. Whether the shoe manufacturers could obtain from the defendants the machines for practicing the process would of course depend upon whether the defendants' machines infringed the plaintiff's machine patent. There is no evidence that the plaintiff ever refused so to license any shoe manufacturer; nor is there any evidence that any shoe manufacturer ever sought such a license. At the oral argument before us counsel for the plaintiff stated that the plaintiff would be willing to grant such licenses on a suitable royalty basis.

(4) The plaintiff might adopt a policy of granting licenses to shoe manufacturers only upon the express condition that all the unpatented materials used in the process must be bought from the plaintiff. Such a condition would be void under the decisions. Carbice Corp. v. American Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819.

(5) A fifth alternative is what the plaintiff did in the case at bar. It granted no express licenses to the shoe manufacturers, but offered to furnish the machines, the pre-coated duck, the top coat and the incidental supervision over the shoe manufacturers' practice of the process in reinforcing the insole. The compensation was fixed as a single charge based on so much per web yard of pre-coated duck supplied by the plaintiff. If, as seems to be the fact, this charge was somewhat higher than the similar charge made by the defendants, it is to be remembered that the plaintiff had something to sell which the defendants could not give, namely, the right to practice the patented process. This method of doing business resulted in giving to the shoe manufacturers who dealt with the plaintiff an implied license to practice the patented process in connection with the unpatented materials furnished by the plaintiff. Such manufacturers did not, however, have any license, express or implied, to practice the process upon unpatented materials procured from other sources.

We are obliged by the decision in Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371, to regard the fifth alternative just mentioned as being the substantial equivalent of the fourth and as being equally objectionable. As the court said (302 U.S. pages 460, 461, 58 S.Ct. page 289):

"For the method of so retarding evaporation the Barber Company acquired the process patent sued on, and seeks to use it to secure a limited monopoly in the business of producing and selling the bituminous material for practicing and carrying out the patented method. The company does not itself engage in road building, or compete with road contractors. It does not seek to make road builders pay a royalty for employing the patented method. It does not grant to road builders a written license to

use the process. *But it adopts a method of doing the business which is the practical equivalent of granting a written license with a condition that the patented method may be practiced only with emulsion purchased from it.* (Italics ours.) For any road builder can buy emulsion from it for that purpose, and whenever such a sale is made, the law implies authority to practice the invention. On the other hand the Barber Company sues as contributory infringer a competing manufacturer of this unpatented material who sells it to a road builder for such use. Thus, the sole purpose to which the patent is put is thereby to suppress competition in the production and sale of staple unpatented material for this use in road building."

At the oral argument it seemed to me that the method of business adopted by the plaintiff in the case at bar could not be considered objectionable in the absence of a finding that the plaintiff had refused or would refuse to grant an unrestricted license to any shoe manufacturer who chose to buy from some other source the materials used in reinforcing the insoles by the patented process. That is, if the plaintiff is prepared to grant an unrestricted license on a royalty basis to any shoe manufacturers who prefer to obtain the unpatented precoated duck and top coat elsewhere, it is difficult at first blush to see how the plaintiff would be doing anything wrong in furnishing the unpatented materials and incidental services at so much per web yard of duck to those shoe manufacturers who prefer to do business with the plaintiff on that basis. But this point was urged in Leitch Mfg. Co. v. Barber Co., supra, and it was pointed out in the plaintiff's brief before the Supreme Court that the plaintiff was "not shown to have refused to grant any license under the patent, much less granted any license conditioned on purchase of emulsion from it." The argument was to no avail. The court considered it sufficient to condemn the plaintiff's method of doing business, that, as matters stood, no road contractor had a license to practice the patented process except those contractors who bought their bituminous emulsion from the plaintiff. The court apparently did not consider it relevant that contractors who were disposed to buy their bituminous emulsion from the defendant or from some other source might, if they had applied to the plaintiff, have obtained an unrestricted express license to practice the process for a stated royalty.

The catch in the professed willingness of the patentee to offer the alternative of an unrestricted license to any shoe manufacturers who prefer to buy the unpatented materials elsewhere is, I suppose, that the terms of such license can be so framed as to render the choice illusory, and thus to leave the patentee's competitors at a disadvantage. See Dehydrators, Ltd., et al. v. Petrolite Corp., Ltd., 117 F.2d 183, decided by the Circuit Court of Appeals for the Ninth Circuit on January 6, 1941; also Barber Asphalt Corp. v. La Fera Grecco Contracting Co., 3 Cir., 116 F.2d 211. In the first of these cases the patentee, who was supplying an unpatented product at a single price which combined a charge for the use of the process and a charge for the product supplied, ran afoul of the Leitch case, so the court held, even though the patentee had publicly offered to any persons who preferred to procure the unpatented product elsewhere the alternative of an unrestricted license to practise the process, upon payment of a royalty based on the difference between the cost of the unpatented product on the open market and the patentee's sale price for the same unpatented product. The court said:

"If the appellee had been more interested in promoting or exploiting its patent than in selling its Tret-O-Lite it would have been a very simple matter to fix a royalty fee of so many cents per gallon whether purchased from the appellee or from outsiders. Indeed, no other course on the part of a patentee who is selling a commercial product to use in the patented process he owns would seem to quite meet the claim that the practice of combining the price of a royalty and of the product in the same unit without separation tends to promote a monopoly in the product if the patent monopoly is not waived."

Suppose the plaintiff adopts the method of business suggested in the passage just quoted, and licenses all shoe manufacturers who want to utilize the process, at a fixed royalty payable whether the manufacturers buy the unpatented materials from the plaintiff or from its competitors. Theoretically, then, the plaintiff and defendants would be on a free competitive basis in the sale of the unpatented materials used in the process. But the patent monopoly gives the plaintiff an undeniable advantage. The royalty exacted might be fixed at a point which would enable the plaintiff to sell the unpatented materials at prices its competitors could not profitably meet, and

still yield the patentee an over-all profit. This profit might indeed be equivalent to the maximum profit that the patentee could have realized by the simple licensing of the process, as previously explained, plus a reasonable profit on the sale of the un-patented materials. If it were sought to extend the doctrine of the Leitch case to cover such a situation, many difficulties would at once be presented, not the least of which would be elusive problems of cost accounting. But if the doctrine is not so extended the patentee may yet be able to exploit the patent monopoly in a way to achieve the result condemned in the Leitch case; and the defendants, in the long run, will be little better off for having escaped an injunction at this point.

I agree that on the decided cases the decree below should be affirmed. However, in view of the differences of opinion that have developed in the lower courts as to the scope and effect of the Leitch case, it may be that the Supreme Court will find an early occasion to review the whole subject matter.