**GENERAL ELECTRIC CO. v. HYGRADE SYLVANIA CORPORATION (RAYTHE-ON MFG. CO., Intervener).**

District Court, S. D. New York.

May 29, 1942.

Alexander C. Neave, of New York City (Harrison F. Lyman and Thomas D. Thacher, both of New York City, of counsel), for plaintiff.

Gifford, Scull & Burgess, of New York City (Newton A. Burgess, of New York City, of counsel), for defendant Hygrade Sylvania Corporation.

Dean S. Edmonds, of New York City, for defendant Raytheon Manufacturing Co.

Thurman Arnold, Asst. Atty. Gen. (Samuel S. Isseks, Ernest S. Meyers and Edward F. Butler, Sp. Assts. to Atty. Gen., of counsel), for the United States.

LEIBELL, District Judge.

The United States of America moves for leave to intervene as a defendant in this patent suit in order to assert certain defenses set forth in a proposed answer annexed to the notice of motion, "on the ground that the patents alleged in the complaint to be infringed by articles manufactured, used and sold by the defendant Hygrade Sylvania Corporation, have been used illegally [by the plaintiff, General Electric Company] in violation of the Federal anti trust laws and in a manner contrary to public policy". It is asserted that "these defenses to the plaintiff's claim present questions of law and of fact common to the main action".

The application is made under Rule 24 (b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, which reads as follows: "(b) *Permissive Intervention.* Upon timely application any-one may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."

The patent suit presents the following issues: (1) the validity of certain claims of two patents owned by General Electric Company; (2) the infringement of the General Electric patents by Hygrade Sylvania Corporation; (3) the validity of the claims of three patents either owned by Hygrade Sylvania Corporation or of which Hygrade holds the exclusive license from the patent owner, Raytheon Manufacturing Company, also a defendant; (4) the infringement of the Hygrade patents by the General Electric Company. All these patents are alleged to involve certain basic principles on which fluorescent lights operate.

The United States through its Special Assistant Attorney General contends that the Court should, pursuant to Rule 24 (b) (2), exercise its discretion in favor of granting the Government's motion for leave to intervene in this patent suit; that the plaintiff comes into Court with unclean hands, having exploited its patents ·in a fashion contrary to the antitrust laws and to public policy; and that therefore this court of equity should "withhold its assistance from such a use of the patent by declining to entertain a suit for infringement". Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 493, 62 S.Ct. 402, 405, 86 L.Ed. ——.

The allegations of the Government's proposed answer charge that General Electric Company by a licensing agreement of December 30, 1937 (Ex. 1) has made an arrangement with Westinghouse Electric Manufacturing Company which "has required, and requires, Westinghouse to maintain the prices of fluorescent lamps manufactured by Westinghouse under such agreement at the prices fixed and followed by General Electric; and Westinghouse and General Electric have maintained, and now maintain, the prices so fixed by General Electric in connection with fluorescent lamps manufactured by Westinghouse and General Electric". (Par. 4.) The proposed answer further alleges that Westing-

house maintains a system of distribution of fluorescent lamps through some 30,000 agents and that General Electric maintains a similar system through 83,000 agents, and that through these two large distribution systems "the prices of particular fluorescent lamps sold by General Electric and Westinghouse to their respective distributors and sold by such distributors to other distributors or to the consuming public are identical". (Pars. 5, 6 and 7.)

The Government alleges that the licensing agreement between General Electric and Westinghouse also provides that the amount of fluorescent lamps and incandescent lamps that may be manufactured by Westinghouse under its license agreement with General Electric "would not exceed 25.44% of the aggregate net sales (in dollars) of fluorescent and incandescent lamps sold by General Electric and Westinghouse"; and that Westinghouse agreed not to sell fluorescent lamps for export "except to those countries where General Electric had the right to export lamps". (Par. 8.)

Other allegations in the proposed answer relate to an agreement, dated July 1, 1939 (Ex. 2), between General Electric and Consolidated Electric Lamp Company, under which Consolidated was licensed to manufacture fluorescent lamps under the two patents in suit, but limited to an amount equal to 3.09% of the net yearly sales of General Electric or in the amount of $100,-000 whichever might be the greater. The royalties payable by Consolidated to General Electric were fixed at 3⅓% of General Electric's list price for the lamps. It is charged that in this way General Electric "in effect controls the price of fluorescent lamps manufactured and distributed by Consolidated". The agreement also provides that Consolidated is not licensed to export fluorescent lamps from the United States. (Par. 9.) Other allegations of the proposed answer (Par. 10) charge in effect that General Electric by another short agreement of July 1, 1933 (Ex. 3) has used its fluorescent patents "for the purpose of extending the period of its monopoly in respect of incandescent lamps", by a tie-up between the fluorescent lamp agreement with Consolidated (Ex. 2) and an incandescent lamp agreement with Consolidated, dated July 1, 1933 (Ex. 4) (Par. 10).

International General Electric Company, Inc., is a wholly owned subsidiary of General Electric. The proposed answer charges that through this subsidiary General Electric has entered into various agreements with the principal lamp companies in foreign countries not to export fluorescent lamps to those countries, and that in turn the foreign companies have agreed not to export fluorescent lamps to the United States. A list of the foreign companies involved is set forth in paragraph 11 of the proposed answer.

The proposed answer also charges that under certain agreements dated December 30, 1937, General Electric, the Claude Paz et Silva (a French corporation) and Claude Neon Lights, Inc., they have agreed to divide the field for the manufacture and distribution of fluorescent lights in the United States, the General Electric taking the "indoor" field and Claude Neon Lights the "outdoor" field. (Par. 12.)

There are some general allegations of the proposed answer, such as those in paragraph 13 that the two patents in suit are part of an aggregation of hundreds of patents and patent rights which General Electric has acquired for the purpose of dominating the electric lamp field, including fluorescent lamps, and are being used for that purpose; that General Electric is the only manufacturer and seller of bases for the fluorescent lamps and of automatic machinery used in making fluorescent lamps, and that the Corning Glass Works, with which General Electric has agreements, controls and dominates the licensing of machinery for the making of glass tubing used in the manufacture of fluorescent lamps and controls and dominates the sale of such glass tubing (Par. 14). It is also alleged that General Electric controls and dominates the manufacture and sale of auxiliary equipment for the operation of fluorescent lamps, such as ballasts and starting switches, and by that means General Electric controls the marketing of fluorescent lamps (Par. 15). There is a further allegation that because fluorescent lighting uses less electrical energy than incandescent lighting, the General Electric Company has suppressed the use of fluorescent lighting "for the purpose of aiding the principal public utility companies". (Par. 16.)

All of the acts complained of against the General Electric Company in the proposed answer of the United States are alleged to constitute "an illegal use of such patents in violation of the Act of Congress of July 2, 1890, c. 647, 26 Stat. 209, as amended, 15 U.S.C.A. § 1, entitled 'An act to protect trade and commerce against unlawful re-

straints and monopolies', said act being commonly known as the 'Sherman Antitrust Act', and the Act of Congress of October 15, 1914, c. 323, 38 Stat. 730, as amended, entitled 'An act to supplement existing laws against unlawful restraints and monopolies and for other purposes', said act being commonly known as the 'Clayton Act', and is contrary to public policy."

The relief sought by the Government under its proposed answer is "that the Complaint herein of General Electric Company be dismissed".

It has been held by the United States Supreme Court in two decisions, in January of this year, that if a plaintiff patentee suing an alleged infringer has used the patent for illegal purposes or contrary to a public policy, then the patentee comes into a court of equity with unclean hands and the Court is justified in denying the patentee any relief against the alleged infringer.

In Morton Salt Co. v. G. S. Suppiger Co., supra, the Court had before it the question of "whether a court of equity will lend its aid to protect the patent monopoly when respondent [the patentee] is using it as the effective means of restraining competition with its sale of an unpatented article. * * *" In connection with the sale of salt tablets by a subsidiary, the patentee licensed its patented machines to canners "to use the machines upon condition and with the agreement of the licensees that only the subsidiary's salt tablets be used with the leased machines". The court held (314 U.S. at page 492, 62 S.Ct. at page 405, 86 L.Ed. ——) : "It is a principle of general application that courts, and especially courts of equity, may appropriately withhold their aid where the plaintiff is using the right asserted contrary to the public interest. Virginian R. Co. v. System Federation, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789; Central Kentucky Natural Gas Co. v. Railroad Commission, 290 U.S. 264, 270, 273, 54 S.Ct. 154, 156, 157, 78 L.Ed. 307; Harrisonville v. W. S. Dickey Clay Mfg. Co., 289 U.S. 334, 337, 338, 53 S.Ct. 602, 603, 77 L.Ed. 1208; Beasley v. Texas & Pacific R. Co., 191 U.S. 492, 497, 24 S.Ct. 164, 165, 48 L.Ed. 274; Securities & Exchange Commission v. United States Realty [& Improvement] Co., 310 U.S. 434, 455, 60 S.Ct. 1044, 1053, 84 L.Ed. 1293; United States v. Morgan, 307 U.S. 183, 194, 59 S.Ct. 795, 801, 83 L.Ed. 1211."

The Court further stated (314 U.S. at page 494, 62 S.Ct. at page 406, 86 L.Ed. ——) : "It is the adverse effect upon the public interest of a successful infringement suit in conjunction with the patentee's course of conduct which disqualifies him to maintain the suit, regardless of whether the particular defendant has suffered from the misuse of the patent."

The reasons for barring the prosecution of such a suit were said to be "* * * fundamentally the same as those which preclude an infringement suit * * * against a vendee of a patented or copyrighted article for violation of a condition for the maintenance of resale prices, Adams v. Burke, 17 Wall. 453, 21 L.Ed. 700; Bobbs-Merrill Co. v. Straus, 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086; Bauer & Cie v. O'Donnell, 229 U.S. 1, 33 S.Ct. 616, 57 L.Ed. 1041, 50 L.R.A.,N.S., 1185, Ann.Cas.1915A, 150; Straus v. Victor Talking Machine Co., 243 U.S. 490, 37 S.Ct. 412, 61 L.Ed. 866, L.R.A. 1917E, 1196, Ann.Cas.1918A, 955; Boston Store v. American Graphophone Co., 246 U.S. 8, 38 S.Ct. 257, 62 L.Ed. 551, Ann.Cas. 1918C, 447; cf. United States v. General Electric Co., 272 U.S. 476, 485, 47 S.Ct. 192, 195, 71 L.Ed. 362." 314 U.S. at page 494, 62 S.Ct. at page 406, 86 L.Ed. ——.

The action of the District Court (31 F. Supp. 876) in dismissing the complaint "for want of equity" was upheld, and the reversal of the District Court's decree by the Circuit Court of Appeals, 7th Circuit (117 F.2d 968), was reversed.

In another case, B. B. Chemical Co. v. Ellis et al., 314 U.S. 495, at page 497, 62 S.Ct. 406, at page 407, 86 L.Ed. ——, decided at the same time as the Morton Salt Co. case, the Court held: "The courts below held that petitioner's sale to manufacturers of the unpatented materials for use by the patented method operated as a license to use the patent with that material alone and thus restrained competition with petitioner in the sale of the unpatented material, as in Carbice Corp. v. American Patents [Development] Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819, and Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371."

In the B. B. Chemical Co. case the District Court had sustained the validity of Claim 4 of the petitioner's patent and ruled that it was infringed by respondent, but nevertheless held that petitioner was debarred from enjoining the infringement because petitioner misused the patent by permitting its use only with certain unpatented material sold by the petitioner. 32

F.Supp. 690. The Circuit Court of Appeals, First Circuit, affirmed the decree of the District Court, dismissing the complaint. 117 F.2d 829. The United States Supreme Court held "that the maintenance of this suit to restrain any form of infringement is contrary to public policy, and that the district court rightly dismissed it". The Supreme Court concluded its opinion with the statement (314 U.S. at page 498, 62 S.Ct. at page 408, 86 L.Ed. ——): "* * * petitioner suggests that it is entitled to relief because it is now willing to give unconditional licenses to manufacturers on a royalty basis, which it offers to do. It will be appropriate to consider petitioner's right to relief when it is able to show that it has fully abandoned its present method of restraining competition in the sale of unpatented articles and that the consequences of that practice have been fully dissipated."

■ It has also been held that a "complainant, entering a court of equity, must come with clean hands", and that the maxim is not limited "to a case where the iniquitous action is one of which the moving party may personally complain"; that "the rule thus invoked need not be pleaded at all"; that "it is not a matter of defense primarily" but that "courts apply it, not to favor a defendant, but because of the interest of the public; courts act sponte sua". Bell & Howell Co. v. Bliss, 7 Cir., 262 F. 131, 135. Cf. McMullen v. Hoffman, 174 U.S. 639, 19 S.Ct. 839, 43 L.Ed. 1117; Memphis Keeley Institute v. Leslie E. Keeley Co., 6 Cir., 155 F. 964, 972, 16 L.R.A.,N.S., 921; American Ins. Co. v. Lucas, D.C., 38 F.Supp. 926, 934. "The court will of its own motion apply the maxim at any stage of the proceedings". General Theatres v. Metro-Goldwyn-Mayer D. Corp., D.C., 9 F.Supp. 546, 549; Gynex Corp. v. Dilex Institute of F. Hygiene, 2 Cir., 85 F.2d 103, 106. Of course, the fraud or other misconduct of the complainant must be "connected with the matter in litigation". Bentley v. Tibbals, 2 Cir., 223 F. 247, 252. The United States Supreme Court, in the Morton Salt Co. case, supra, and the B. B. Chemical Co. case, supra, has held that the conduct of a patentee in using a patent "contrary to public policy" is connected with a suit for infringement of the patent, so that the misconduct falls within the bar of the equitable maxim of "clean hands", and the patentee's infringement suit fails "for want of equity".

The General Electric Company in opposing the Government's motion to intervene contends that its own licensing distribution system through its "agents" and its licensing arrangement with Westinghouse, including the use of that company's distribution system of "agents", were before the United States Supreme Court in United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362, and were held not to violate the Anti-Trust Act of July 2, 1890, 26 Stat. 209, c. 647, the Sherman Act, and the validity of the license granted by the Electric Company to the Westinghouse Company was sustained. In a recent case, United States v. Masonite Corp. et al., 62 S.Ct. 1070, 1077, 86 L.Ed. ——, decided May 11, 1942, the United States Supreme Court referred to the General Electric Company case as follows: "We do not have here any question as to the validity of a license to manufacture and sell, since none of the 'agents' exercised its option to acquire such a license from Masonite. Hence we need not reach the problems presented by Bement & Sons v. National Harrow Co., 186 U.S. 70, 22 S.Ct. 747, 46 L.Ed. 1058, and that part of the General Electric case which dealt with the license to Westinghouse Company. Rather we are concerned here only with a license to vend. But it will not do to say that since the patentee has the power to refuse a license, he has the lesser power to license on his own conditions. There are strict limitations on the power of the patentee to attach conditions to the use of the patented article."

It may be that the present arrangement of General Electric with Westinghouse goes beyond the licensing agreement passed upon by the United States Supreme Court in 1926. However, there are other allegations in the proposed answer of the Government, submitted on its motion to intervene, which, coupled with the Westinghouse agreement, charge in effect a plan on the part of the General Electric Company to fix resale prices; to limit the quantity of lamps which a licensee may manufacture; to divide markets, foreign and domestic; to limit the manufacture for export, and to prevent imports, all of which are alleged to prevent competition and to restrain interstate and foreign commerce, in violation of the antitrust laws and contrary to public policy.

The Special Attorney General by this motion to intervene places before the Court all of these allegedly illegal acts of the

plaintiff in the use of its two patents in suit. These charges cannot be ignored by this Court even though the application of the Attorney General for leave to intervene is, for other reasons, denied at this time. On the allegations of the Government's proposed answer, if nothing more appeared, the Court would be under a duty to inquire into the charges presented. Of course, the court itself would be in no position to assemble any evidence bearing on the said charges and unless the defendants raised the same issues and presented some proof thereon, the Court in the exercise of its discretion, under Rule 24(b)(2), Federal Rules of Civil Procedure, would be obliged to grant the application of the United States for leave to intervene, so that some proper party might be before the Court to submit whatever evidence is available in support of the charges.

On the argument of this motion the attorney for defendant Hygrade stated: "I merely want to state that the defendant, Hygrade Sylvania Corporation, has no desire nor intention to oppose or interfere with the plan of the Government to intervene in the case. If the Court should decide to grant the motion, Hygrade has no objection whatever, but I assume that provision would be made for amending the pleadings accordingly. However this position we take is without prejudice to any right to make use of the defense in the future. That is all I have to say for Hygrade."

■■ If the defendant decides to present evidence on these issues it will be unnecessary for the Government to intervene. A private litigant may raise the issue, as was done in the Morton Salt Co. case and the B. B. Chemical Co. case, supra. For that reason alone the government's motion should be denied, at this time. If the defendant fails to present the issues alleged in the government's proposed answer, the government may renew its motion to intervene.

■ There are other reasons why the Government's motion should be denied, without prejudice to a renewal. It appears from the affidavits submitted by the plaintiff in opposition to the motion that the issue of the legality of several of the agreements annexed to the Government's proposed answer is presented by a bill of complaint filed on January 29, 1941 in the District Court of the United States for the District of New Jersey, wherein the United States of America is the complainant and the General Electric Company, the International General Electric Company, Incorporated, the Westinghouse Electric and Manufacturing Company, the Corning Glass Works, the Consolidated Electric Lamp Company and others are defendants. (Civil Action No. 1364.) The trial of that case has been adjourned because it would take many months of the time of General Electric and other company officials whose efforts should be devoted, without interruption, to the speedy fulfillment of numerous essential war contracts involving hundreds of millions of dollars. Those war contracts are "first things" which in the opinion of the War and Navy Departments take precedence over the trial of the antitrust suit. I am fully in accord with the viewpoint of those who are charged with a successful conduct of this "war of survival". I do not see why any different rule should be applied to the Government's application for leave to intervene in this present patent suit, to try here many of the issues involved in the New Jersey suit.

Further, the Special Assistant Attorney General states in effect that because he believes the New Jersey antitrust suit involves illegal combinations in respect to the manufacture and sale of incandescent lamps only, he proposes to file in this Court an antitrust suit alleging similar illegal conduct of the plaintiff and others in the manufacture and sale of fluorescent lamps, and that in said suit he will seek an injunction restraining General Electric from proceeding with the patent suit now on trial before me.

The present trial has covered 1756 pages of testimony during which over a hundred exhibits have been received in evidence. The trial of the issues as to the validity of plaintiff's and defendant's patents and their alleged infringement will take at least another week. After that briefs will be prepared and submitted and those issues will be taken under advisement. After I have prepared my opinion on the patent issues, I shall again survey the situation in respect to the antitrust suits and the attitude of the defendant in respect to the charges contained in the Government's proposed answer. If it then appears advisable to have the Government renew its motion to intervene, I shall so advise the Attorney General and no decree will be entered in this patent suit before that.

The Government's motion for leave to intervene in the patent suit is denied, without prejudice to a renewal at such time as the Court may indicate.

Submit order on notice.