### GENERAL ELECTRIC CO. v. HYGRADE SYLVANIA CORPORATION et al.

District Court, S. D. New York.

July 7, 1944.

See also 61 F.Supp. 539.

Alexander C. Neave, of New York City (John H. Anderson, of Cleveland, Ohio, and Rowland V. Patrick, of Boston, Mass., of counsel), for plaintiff.

Gifford, Scull & Burgess, of New York City (Newton A. Burgess, of New York City, of counsel), for defendant Hygrade Sylvania Corporation.

LEIBELL, District Judge.

I decided this patent suit on March 30, 1944, filing Findings of Fact and Conclusions of Law, together with an opinion in which I set forth the reasons for my decision and discussed many of the points raised by the respective counsel. 61 F. Supp. 476. While this case was at trial the Government sought leave to intervene and to file an answer on the ground that plaintiff had used its patents illegally, "in violation of the Federal anti-trust laws and in a manner contrary to public policy." On the argument of the Government's motion the attorney for the defendant Hygrade stated:

"I merely want to state that the defendant, Hygrade Sylvania Corporation, has no desire nor intention to oppose or interfere with the plan of the Government to intervene in the case. If the Court should decide to grant the motion, Hygrade has no obection whatever, but I assume that provision would be made for amending the pleadings accordingly. However this position we take is without prejudice to any right to make use of the defense in the future. That is all I have to say for Hygrade."

In the opinion I filed on the Government's motion (45 F.Supp. 714, 719) I stated that "if the defendant fails to present the issues alleged in the government's proposed answer, the government may renew its motion to intervene." I referred also to the fact that the Government then had an anti-trust suit pending in the District Court of the United States for the District of New Jersey against this plaintiff and others, charging that certain licensing agreements of plaintiff in respect to patents for incandescent lamps were in restraint of trade and illegal, under the Federal Anti-Trust statutes. [Some of the licensing agreements referred to these patents for fluorescent lamps, but the Government's then pending suit was concerned principally with patents for incandescent lamps.] Further, the special assistant Attorney General stated that it was the purpose of the Government to file an anti-trust suit against the plaintiff and others charging similar illegal conduct in relation to licensing agreements controlling the manufacture and sale of fluorescent lamps under the patents involved in this patent litigation. I denied the Government's motion for leave to intervene herein, without prejudice to a renewal at such time as this Court might indicate.

In my opinion of March 30, 1944, disposing of this patent litigation, I reviewed the situation in respect to the Government's motion for leave to intervene and I noted that since my decision of that motion, the Government had instituted in the District Court in New Jersey a second anti-trust suit against the plaintiff and others charging an illegal combination in restraint of trade, evidenced in part by certain agreements relating to the manufacture and sale of fluorescent lamps by licensees of General Electric Company. I quote the following from my opinion [61 F.Supp. 531]:

"The defendants herein definitely stated on the record at the end of the trial that they did not intend to raise the issue of 'unclean hands' or 'public policy', by amending their answers herein to plead a violation of the anti-trust laws by plaintiff in making licensing and other agreements involving plaintiff's patents in suit."

I therefore concluded that if the issue was to be presented in this patent litigation the Government would have to renew its motion for leave to intervene and file an answer herein. Accordingly I inquired if the Government intended to renew its motion for leave to intervene herein or if it would seek a stay of the entry of a de-

cree in this patent suit pending the decision of the New Jersey anti-trust litigation.

As a result of that inquiry the Government made a motion herein on June 2, 1944, and on June 24, 1944, I entered an order, providing as follows:

"It is hereby ordered that the entry of any interlocutory or other decree in the above entitled cause shall be suspended and stayed until after the final disposition by appeal or otherwise of the action entitled United States v. General Electric Company et al., Civil Action No. 2590, filed December 9, 1942, in the United States District Court for the District of New Jersey;

"And it is hereby further ordered that the entry of this order shall be without prejudice to the right of the United States of America to renew its motion for leave to intervene herein."

About the same time that the Government made its motion on which the above order was entered, the defendant's attorney advised me that he too was bringing on some motions. The defendant's motions were contained in one notice and came on for a hearing June 23rd. Motion #1 is—

"For leave to amend its answer herein by inserting on page 4 thereof the following: '12. That plaintiff is barred from relief under both the Hull patent and the Meyer et al. patent in suit because it has misused the Hull patent in an effort to control competition in unpatented devices."

The burden of defendant's argument is that claim 3 of the Hull patent is for—

"3. The combination of

"(1) 'an electric current source having a voltage materially greater than fifty volts,

"(2) 'an electric discharge device connected thereto comprising a thermionic cathode, an anode, a container therefor, and a gas therein having a pressure within the range of several microns to several millimeters of mercury' and

"(3) 'means for maintaining the ion bombardment voltage with respect to said cathode less than a critical value characteristic of the nature of the gas in said container at which destructive disintegration of said cathode would occur.' ";
that defendant Hygrade does not supply all three elements, only the second, the electrical discharge' device 'and therefore at

best is only a contributory infringer; that plaintiff issues licenses under the Hull and other patents and that "the amount of sales is measured in lamps"; that the lamp is not patented but only the combination of the lamp and other elements; that under the doctrine of The Mercoid Corporation v. Mid-Continent Investment Co., et al., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376, plaintiff may not control the sale of an unpatented device as part of a patented whole. Defendant Hygrade also asserts that by these means plaintiff is seeking "to control competition in Hygrade fluorescent lamps."

The main defect in defendant's argument, as thus constructed, is that it is based on the false assumption that plaintiff's electrical discharge device is not patented. The subject of the Hull patent is an "electrical discharge device and method of operation." The specification, in the second paragraph, states that "The present invention relates to electrical discharge devices of the thermionic type." Claims 6, 7, 8, 9, 10, 11, 12, 13, 14 all relate to the electrical discharge device itself. It is a rectifier. The validity of plaintiff's patent in this rectifier was conceded by defendant Hygrade in a prior litigation in this Court and a consent decree entered in December 1934. Plaintiff's electrical device is patented. That clearly distinguishes this case from the Mercoid case where the court said "that the competition which is sought to be controlled is not competition in the sale of the patented assembly but merely competition in the sale of unpatented thermostatic controls." No such situation is here presented.

There would be no invention in combining an old electrical discharge device with an electrical circuit having a voltage exceeding 50 volts, and with an impedance in the circuit. But as plaintiff's counsel argues, in Hull's invention we have a new electrical discharge device built for operation in such a circuit.

I have discussed in my opinion, (61 F. Supp. 486), filed in deciding the patent suit, many features of Hull's electrical device, described and explained in the specification of the patent. There is no need for repeating them. I concluded that "Hull's invention in patent No. 1,790,153 is employed in the fluorescent lamp in order to prolong the life of the cathode." 61 F. Supp. 491.

On the argument of this present motion defendant Hygrade directed the Court's

attention to defendant's Exhibits CCCC and DDDD. The first is a book of license agreements between General Electric Company and Westinghouse Electric and Manufacturing Co. covering a period from 1927 to 1938. I find no reference to the Hull patent in Exhibit CCCC. But even if it were therein referred to, that would not be of any importance in the decision of this motion. In Exhibit DDDD (the so-called B license relating to Electric Discharge Lamps) the Hull patent is listed at the end of the agreement as follows:

| Number | Name | Date | Title |
|--------|------|------|-------|
| 1,790,153 | Hull | Jan. 27, 1931 | Broad Cathode |

The term electric discharge lamps is defined in Exhibit DDDD as follows:

"(A) The term 'electric discharge lamp' as used herein means every device, and only every device, the primary purpose and/or primary use of which is to convert electric energy into light within the visible spectrum, or into light approximating the sun's spectrum, by excitation of gas and/or vapor within said device, with or without means for converting invisible light produced within the device to visible light. The term 'electric discharge lamp' does not include or embrace starting, regulating, operating, reflecting, housing, jacketing or other devices used or useful with such lamp but which are not an integral part of the lamp itself." [Note the last sentence of the above quotation.]

So by the terms of the agreement all the external connections or devices "used or useful with such lamp but which are not an integral part of the lamp itself" are excluded from the scope of the license agreement. Thus this situation is not at all similar to that of the Mercoid case, where the patent (#1,758,146 issued to Walter M. Cross May 13, 1930) related to a combination of unpatented parts.

In the opinion written by Mr. Justice Douglas the controversy was described as follows [320 U.S. 661, 64 S.Ct. 270]:

"The controversy centers around the license agreement between Mid-Continent and Minneapolis-Honeywell. By that agreement Minneapolis-Honeywell received an exclusive license to make, use, sell, and to sub-license others to make, use, and sell the Cross combination patent No. 1,758,-146. The royalty payments under the license, however, were to be based only upon sales of the combustion stoker switch which was an element of the combination patent embodied in the patented article but which was itself unpatented. The license agreement was construed by the Circuit Court of Appeals to mean that the royalty payments were to be made only on switches used for fire maintenance purposes under the Cross patent. And Minneapolis-Honeywell in advertising its stoker switches stated that the 'right to use' the Cross system patent was 'only granted to the user' when the stoker switches of Minneapolis-Honeywell were purchased from it and used in the system. Neither Mid-Continent nor Minneapolis-Honeywell manufactures or installs heating systems under the Cross combination patent. There was ample evidence to sustain the findings of the District Court that respondents endeavored to use the license agreement so as to prevent the sale or use of combustion stoker switches in these heating systems unless they were the switches made by Minneapolis-Honeywell and purchased from it or its sub-licensees."

Mr. Justice Douglas concluded:

"Ever since Henry v. A. B. Dick Co., 224 U.S. 1, 32 S.Ct. 364, 56 L.Ed. 645, Ann.Cas. 1913D, 880, was overruled by Motion Picture Co. v. Universal Film Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A. 1917E, 1187, Ann.Cas.1918A, 959, this Court has consistently held that the owner of a patent may not employ it to secure a limited monopoly of an unpatented material used in applying the invention. Carbice Corp. v. American Patents Corp., supra [283 U.S. 27, 51 S.Ct. 334], 75 L.Ed. 819; Leitch Mfg. Co. v. Barber Co., supra, [302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371]; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 404, 86 L.Ed. 363; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367. In those cases both direct and contributory infringement suits were disallowed on a showing that the owner of the patent was using it 'as the effective means of restraining competition with its sale of an unpatented article.' Morton Salt Co. v. G. S. Suppiger Co., supra, 314 U.S. [489, at] page 490, 62 S.Ct. [402], 86 L.Ed. 363. The Court has repeatedly held that to allow such suits would be to extend the aid of a court of equity in expanding the patent beyond the legitimate scope of its monopoly. It is true that those cases involved the use of the patent for a machine or process to secure a partial monopoly in supplies consumed in its operation or unpatented materials employed in it. But we can see no difference in principle where the unpa-

tented material or device is itself an integral part of the structure embodying the patent.

*     *     *     *     *

"But the fact remains that the competition which is sought to be controlled is not competition in the sale of the patented assembly but merely competition in the sale of the unpatented thermostatic controls. The patent is employed to protect the market for a device on which no patent has been granted. But for the patent such restraint on trade would plainly run afoul of the anti-trust laws. If the restraint is lawful because of the patent, the patent will have been expanded by contract. That on which no patent could be obtained would be as effectively protected as if a patent had been issued."

General Electric does not require that its licensees purchase any unpatented materials or any unpatented appliances from General Electric. In fact, the license agreement has no requirement that anything be purchased by the licensees from General Electric. It is a license to manufacture, and the only appliance covered by the license is the patented electrical discharge device, the fluorescent lamp.

For the above reasons also, I must deny defendant's motion #3 for an additional finding of fact in substance that—

"Plaintiff has misused and still is misusing the Hull patent in suit to extend the monopoly of the Hull combination patent to control competition in fluorescent lamps alleged to be only one of the elements of the Hull combination claim in suit."

and defendant's motion #5—

"For additional conclusion of law holding in substance that because of plaintiff's misuse of the Hull patent in suit no relief will be granted in this action."

■ Another and by no means technical reason for denying motion #1 is found in Rule 15(b), F.R.C.P., 28 U.S.C.A. following section 723c. The issues defendant would present by the amendment of the answer were not raised by the pleadings and were not tried either by express or implied consent of the parties. In fact, they were expressly excluded by defendant's counsel, when the Court on several occasions asked defendant's counsel whether or not he would raise the issue of public policy and the anti-trust laws, which, if established, would deny plaintiff any relief, because of plaintiff's allegedly "unclean hands."

The defendants at the trial deliberately refrained from raising any issue based on the alleged use by plaintiff of the Hull or Meyer patents in a manner contrary to public policy and contrary to the provisions of the anti-trust laws. This appears from the colloquy of court and counsel on the last day of the trial, when defendant offered in evidence the license agreements (Exs. CCCC and DDDD), to which plaintiff objected. Defendant's counsel in reply to a query of the Court said "The present purpose of offering those (exhibits) is not for that" (to raise the issue of public policy and the anti-trust laws), but for the purpose of "explaining the testimony of the witness Brown," who as a witness for plaintiff had testified that a license agreement had been offered defendant Hygrade. The exhibits were then received for that limited purpose, which was not thereafter extended.

I could properly dispose of defendant's motion #1 by saying simply that defendants were given the chance to raise those issues at the trial and that they did not choose to do so. They should not now be permitted to change their position after they have lost the patent suit and after proper provision has been made for a stay of any decree herein until the Government's anti-trust suit against General Electric and others in the District Court in New Jersey has been disposed of. Under the circumstances it seems preferable to have the Government raise and present the issues of "unclean hands" and "public policy" based on plaintiff's alleged violation of the anti-trust laws.

Submit one order denying defendant Hygrade's motions #1, 3 and 5.

■ Defendant Hygrade makes three other motions, which should be grouped together and considered next. Motion #2 is—

"For leave to amend its answer herein by inserting at the end of paragraph 11 the following:

"(i) Because original claims 16 and 17 were deliberately cancelled in the face of specific objections of the Examiner based on certain prior art patents; the Meyer application was amended by plaintiff on October 9, 1939 to add claim 13 in suit and on November 3, 1939 to add claim 27 in suit to strengthen its patent position on fluorescent lamps; that no claim embodying luminescent material was part of the application between August 28, 1928 and

October 9, 1939, and as a result Meyer abandoned all claim to the use of luminescent material with metal or mercury vapor lamps and that this abandonment plus intervening public rights render claims 13 and 27 in suit invalid and therefore plaintiff is estopped to disclaim."

Motion #4 is—

"For additional finding of fact that in August, 1928, plaintiff abandoned all claim to the use of luminescent material with metal or mercury vapor lamps and that claims 13 and 27 in suit were inserted by amendment in 1939 by plaintiff to strengthen its patent position on fluorescent lamps; that public rights had intervened and that this abandonment plus the intervening public rights rendered these claims invalid."

And Motion #6 is—

"For additional conclusion of law that claims 13 and 27 of the Meyer patent are invalid and that because of plaintiff's deliberate cancellation in 1928 and abandonment of original claims 16 and 17 and the addition in 1939 of claims 13 and 27 to strengthen its patent position in fluorescent lamps after such abandonment and the intervening of public rights, plaintiff is estopped to disclaim invalid claims 13 and 27, wherefore the Meyer patent is invalid in toto."

Findings 23 and 24 of the Findings of Fact, which I filed March 30, 1944, read as follows:

"23. The combination of elements defined in claims 6, 13, 25 and 27 of said Meyer, Spanner and Germer patent was not disclosed in the prior art, was new and useful. Claims 6 and 25 involved invention on the part of Meyer, Spanner and Germer: so did claims 13 and 27, except for their concluding clauses referring to 'luminescent material' and 'fluorescent material', respectively."

"24. The idea of luminescent or fluorescent material as an element of the patent specification and claims was abandoned by Meyer August 28, 1928. It was restored to the specification Oct. 12, 1932; but no claims including any reference to luminescent or fluorescent material were reasserted until claims 13 and 27 were added in October and November 1939. Meanwhile the rights of the public intervened, through the sale of over several million General Electric fluorescent lamps in 1938 and 1939."

In discussing these facts I stated:

"In my opinion this constituted an abandonment by Meyer of any claim to the use of luminescent material with the metal vapor lamp. It was deliberately made in the face of specific objections of the Examiner based on the citation of certain patents in the prior art alleged to have anticipated Meyer. Original claims 16 and 17 were thus abandoned August 1928. In September 1935 the General Electric Company exhibited its flourescent lamp at the Cincinnati exposition and in April 1938 the General Electric fluorescent lamps were listed for sale commercially.

"General Electric Company acquired title to the Meyer application in May 1939. The application was amended October 9, 1939 to add claim 13, and on November 3, 1939 to add claim 27, both involved in this litigation. Claim 13 ends with a provision for 'luminescent material enclosed in said vessel'; and claim 27 calls for 'fluorescent material disposed in the path of said spectral ray emission'. This was done by General Electric to strengthen its patent position on flourescent lamps. But public rights had intervened. The General Electric fluorescent lamps had been put on the market extensively in April, 1938. Abandonment, plus the intervening public rights, render invalid these new claims 13 and 27 of the patent as issued, in so far as they include luminescent or fluorescent material."

The purpose of defendant Hygrade in making these motions is to have this Court rule that plaintiff is estopped from filing a "disclaimer" as to claims 13 and 27, and that therefore the Court should declare the entire Meyer, Spanner and Germer patent invalid.

The File Wrapper record of the Meyer, Spanner and Germer patent shows that the application was filed in the United States Patent Office December 19, 1927, and that its predecessor, the German patent, was filed in Germany, December 10, 1926.

The first action of the Patent Office in reference to this application was taken June 22, 1928, when all claims, except claim 15, were rejected. In rejecting claims 16 and 17 the Examiner stated:

"Claim 16 is further rejected as lacking novelty and invention over French patent 589,856

"Claim 17 is met by French pat. 589,856 and Ger. pat. 308,488 and is therefore rejected."

In the list of references set forth at the top of his statement the Examiner enumerated nine patents, including—

"French patent, 589,856, Aug. 11, 1925, 176–122, 1st addition,

"German patent, 308,488, Jan. 14, 1917, 250–27.5–2.1,"

Claims 16 and 17 of the Meyer, Spanner and Germer application as filed December 19, 1927, read as follows:

"16. Source of ultraviolet rays comprising an envelope consisting of a luminescent material highly pervious to ultraviolet rays, a mixture of a current-conductive gas and a metal vapor enclosed in said envelope, and means for producing electric discharges across said mixture."

"17. Source of ultraviolet rays comprising an envelope consisting of a material highly pervious to ultraviolet rays, a mixture of a current-conductive gas and a metal vapor and a luminiscent substance enclosed in said envelope, and means for producing electric discharges across said mixture."

In response to the Patent Office Action of June 22, 1928, the applicant's then attorney, on August 28, 1928, asked leave to amend the patent application in a number of particulars, and in the "Remarks" annexed to the proposed amendments he stated:

"It is interpreted that German patent 308,488 is cited to bring out that the use of luminous substances in discharge tubes is old, and not that this patent has any direct bearing on the matter of a source of ultraviolet rays. The matter of luminosity is not specifically made a feature of the claims as rewritten.

"French patent 589,856 cited against claims 16 and 17 for the feature of luminosity is noted, and as before stated this feature per se is not made a part of the rewritten claims."

On this present motion, I have examined the German patent #308,488 and its translation, as set forth in Exhibit K–1, and I find therein no reference to the use of any luminescent or fluorescent material. The very purpose of the German patent would indicate that there would be no need whatsoever for luminescent or fluorescent material in its construction; it is for an "amplifier device for feeble alternating currents consisting of a discharge tube." There is a reference in the German patent to the use of radio-active matter. The nature of the matter is indicated by a reference to the fact that one of the cells might have a leaden cover. Clearly the German patent has no bearing on the issue.

I have also examined French patent 589,856 and its translation as set forth in Exhibit K–1. I do not find therein any reference to the use of luminescent or fluorescent material. The French patent 589,856 has a notation at the head thereof, which states that it was filed November 29, 1924, issued March 4, 1925, and published June 6, 1925. But the Office Action of the Examiner dated June 22, 1928, refers to this patent as "dated August 11, 1925—1st addition." I therefore concluded that this referred to some amendment to the patent as of that date, August 11, 1925. The amendment was not included in Exhibit K–1 and I had no means of knowing what its contents were. I sent for counsel this week and they have obtained for me a copy of this August 11, 1925, "addition," together with a translation thereof. It very specifically refers to the use of luminescent and fluorescent material in the glass envelope of the tube and the action of ultra violet waves upon that material. When the so-called "addition" of August 11, 1925, is read, the further discussion of French patent #589,856, as made in the "Remarks" of applicant's attorney on August 28, 1928, is understandable. He said:

"This patent [French patent 589,856] however, throws considerable light upon the general relation of the art cited to the invention of applicants. As before pointed out, all of the art cited broadly against the feature of the production of ultraviolet rays is limited to the matter of producing light for illumination purposes, and none of it makes any use of the incidental production interiorally of the envelope of ultraviolet rays, except French patent 589856, and the use made of it in this patent clearly points out the great difference between the invention of applicants and the art cited. Commencing at line 22 and continuing through line 36, page 1, the French patent makes clear that that part of the energy in the lamp which goes towards the production of ultraviolet rays is a loss in the matter of illumination, and the patent proposes the unique feature of converting the energy of this ultraviolet ray component from its invisible frequency to a visible frequency by the use of luminous substances, thereby saving this energy for useful application

to the specific purpose to which the lamps of all of the references are directed. This pointedly brings out that applicants are now taking a component which in the other lamps cited was a detriment and are putting this component to a useful end in a specific and practical way, and that the mere incidental production of ultraviolet rays in illuminating lamps with no provision made for the use of these rays exteriorally of the lamp is not sufficient to anticipate the most useful invention of the present application of applicants."

Lines 22 to 36 of page 1 of the addition to the French patent made August 11, 1925, as translated, read as follows:

"It is found, nevertheless, that a considerable portion of the light radiated by the metallic vapor is in the ultraviolet range of the spectrum, so that this portion is lost, as far as the visible light is concerned. In accordance with this invention it is possible to make visible a great part of the ultraviolet light by using as the material of the wall of the discharge tube a kind of glass containing a fluorescent substance. The fluorescent substance increases the length of the ultra-violet rays to such an extent that the light produced by fluorescence is in the visible portion of the spectrum."

The "Addition" to the French patent has the following concluding paragraphs on fluorescent materials:

"The addition pertains to a discharge tube to produce light by a positive column, containing an atmosphere composed of one or several of the gases of argon, xenon or crypton, as well as mercury or cadmium vapor, as specified in the original application, said tube having a glass wall which contains a fluorescent substance, this discharge tube having amongst others the following particulars, separate and in combination:

"1. The wall of the glass tube contains a combination of uranium.

"2. It is composed of a kind of glass which diffuses light.

"3. This glass is of unpolished glass."

The original specification of the Meyer, Spanner and Germer patent, filed December 19, 1927, contained the following reference to fluorescent material:

"If the envelope, tube or bulb forming part of the lamp is made of or formed with coatings or jackets of partly or entirely fluorescent material, the lamp can also be used with advantage for advertising purposes."

That reference was eliminated from the amended Meyer, Spanner and Germer specification as filed August 28, 1928; but when the entire original specification was restored by the applicant on October 12, 1932, it again became a part of the specification. However, the use of luminescent or fluorescent material was not restored to any of the claims, until claim 13 was added October 6, 1939. By a paper dated October 31, 1939, filed in the Patent Office November 2, 1939, the specification was also amended, by adding thereto the following sentence: "The fluorescent material may be enclosed in said envelope" and claim 27 was added.

The law in relation to "disclaimers" in patent cases was discussed by Chief Justice Stone in Marconi Wireless Telegraph Co. v. United States, 320 U.S. 1 at pages 57-59, 63 S.Ct. 1393, at page 1419, 87 L.Ed. 1731. In referring to the provisions of the statute (35 U.S.C.A. §§ 65, 71) and the conduct of a patentee, Fleming, in relation to certain claims of his patent and the delay in filing a disclaimer thereof, the Chief Justice in effect stated that if Fleming claimed as his invention something that he knew was old, the specified claims would be invalid and *the invalidity would defeat the entire patent* "unless the invalid portion had been claimed 'through inadvertence, accident, or mistake, and without any fraudulent or deceptive intention,' and was also disclaimed without 'unreasonable' neglect or delay." And the Chief Justice remarked that "Both of these are questions of fact" for the Court to decide.

Defendant Hygrade did not present these issues by its answer herein which it amended shortly before trial. It now seeks further to amend its answer to plead the defence that plaintiff is estopped to disclaim claims 13 and 27 of the Meyer, Spanner and Germer patent *as issued*. From Exhibit K (the file wrapper of the Meyer, Spanner and Germer patent application) I spelled out findings of fact #23 and 24 and I concluded that the introduction of claims 13 and 27 by amendments of October 6, 1939 and November 3, 1939, was done by General Electric to strengthen its patent position in fluorescent lamps, after it had acquired the Meyer, Spanner and Germer patent application in May 1939. But the issues of fact intended to be raised by this defense of "estoppel to disclaim" were not fully litigated at the trial. It may be that the parties to this litigation would like to have the trial reopened for the purpose of

submitting evidence on the issues raised by this defense.

I have decided to grant motion #2 of defendant Hygrade, for leave to amend its answer to plead the defense of estoppel to disclaim. Defendant's motion #4 for an additional finding of fact and motion #6 for an additional conclusion of law are denied at this time without prejudice. In the separate order which will be entered on these three motions (#2, 4 and 6), provision should be made for the reopening of the trial of this case on a day certain (in the second week of October) to receive such evidence as the parties may wish to offer on the issues raised by this new defense of estoppel. If both sides decide to rest their case as to this defense, on what appears in Exhibit K and in the addition of August 11, 1925, to French patent #589,856, they should so advise the Court promptly and defendant's motions 4 and 6 will then be disposed of on the merits.

Submit orders accordingly on two days' notice.